Nos. 2015-1925, -1942 & -1943

# United States Court of Appeals
# for the Federal Circuit

J. CARL COOPER,

*Patent Owner-Appellant*,

*v.*

SQUARE, INC.,

*Petitioner-Appellee.*

**Appeal from the United States Patent and Trademark Office Patent Trial and Appeal Board, Case Nos. IPR2014-00156, IPR2014-00157 & IPR2014-00158**

**ANSWERING BRIEF OF PETITIONER-APPELLEE SQUARE, INC.**

Erika Arner
Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP
Two Freedom Square
11955 Freedom Dr.
Reston, VA 20190-5675
Phone: (571) 203-2700
Facsimile: (202) 408-4400

Aaron Capron
Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP
3300 Hillview Avenue
Palo Alto, CA 94304
Phone: (650) 849-6600
Facsimile: (650) 849-6666

Theodore J. Angelis
Ben Hellerstein
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Phone: (206) 623-7580
Facsimile: (206) 623-7022

December 18, 2015                    Attorneys for Square, Inc.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the appellee Square, Inc. certifies the following:

1.      The full name of every party or amicus represented by me is:
        Square, Inc.

2.      The name of the real party in interest (if the party named in the caption is not
        the real party in interest) represented by me is:
        N/A

3.      All parent corporations and any publicly held companies that own 10 percent
        or more of the stock of the party or amicus curiae represented by me are:
        None.

4.      The names of all law firms and the partners or associates that appeared for
        the party or amicus now represented by me in the trial court or agency or are
        expected to appear in this court (and who have not or will not enter an
        appearance in this case):

        Sean Damon, Finnegan, Henderson, Farabow, Garrett & Dunner LLP


Dated:    December 18, 2015                    /s/ *Theodore J. Angelis*
                                               Theodore J. Angelis

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................................. ii

TABLE OF ABBREVIATIONS .......................................................................... xi

INTRODUCTORY STATEMENT .........................................................................1

COUNTERSTATEMENT OF THE ISSUES..........................................................2

COUNTERSTATEMENT OF THE FACTS ...........................................................2

    I.     THE PATENTS.........................................................................2

    II.    THE PRIOR ART .....................................................................8

          A.    Pitroda .......................................................................9

          B.    Kikinis .....................................................................10

          C.    Gutman ....................................................................12

    III.   PROCEDURAL HISTORY OF COOPER'S
           CONSTITUTIONAL ARGUMENTS ................................13

SUMMARY OF THE ARGUMENT ...................................................................14

STANDARDS OF REVIEW ...............................................................................17

ARGUMENT ......................................................................................................20

    IV.   THE BOARD PROPERLY CONCLUDED THAT PITRODA
           ANTICIPATES THE CLAIMS AT ISSUE FROM THE '005
           AND '207 PATENTS ....................................................20

          A.    The Board correctly construed "emitter" ('005 Patent,
               claims 1-6; '207 Patent claims 1 & 8-14)..................21

          B.    Substantial evidence supports the Board's factual findings .....26

               1.    Substantial evidence supports the Board's finding
                    that Pitroda discloses an "emitter" ('005 Patent,
                    claims 1-6; '207 Patent claims 1 & 8-14).......................26

2.      Substantial evidence supports the Board's finding that Pitroda discloses a "control circuit" ('005 Patent, claims 1-6; '207 Patent claims 1 & 8-14)......................30

3.      Substantial evidence supports the Board's finding that Pitroda discloses an "operator interface" and "account location" ('005 Patent, claims 2-6; '207 Patent claims 9-12) ........................................................36

4.      Substantial evidence supports the Board's finding that Pitroda discloses an "account identifier" and "account identifier means" ('005 Patent, claims 3-4 & 6; '207 Patent claims 10-12)........................................40

V.      THE BOARD PROPERLY CONCLUDED THAT KIKINIS ANTICIPATES THE CLAIMS AT ISSUE FROM THE '875 PATENT......................................................................................43

A.      Cooper forfeited the claim construction arguments he raises on appeal ..................................................................................44

B.      The Court should reject Cooper's claim construction arguments ...............................................................................46

1.      "Emitter" does not require "communication to an outside device" ('875 Patent claims 1-7, 9-13) ..............46

2.      The Board correctly determined that "in a telephone" needs no construction ('875 Patent claims 1-7, 9-13, 25-31, 33 & 34)................................................................49

3.      The Board correctly construed "identification card account" ('875 Patent claim 12) ....................................51

C.      Substantial evidence supports the Board's factual findings .....52

1.      Substantial evidence supports the Board's finding that Kikinis discloses "memory" ('875 Patent claims 1-7, 9-11, 13, 25-31, 33 & 34)........................................53

2.      Substantial evidence supports the Board's finding that Kikinis discloses an "emitter" ('875 Patent

claims 1-7, 9-13) and "using ... to send" ('875 Patent
claims 25-31, 33 & 34) .....................................................54

3.    Substantial evidence supports the Board's finding
      that Kikinis discloses a "display" ('875 Patent claims
      1-7, 9-13, 25-31, 33 & 34) .............................................56

4.    Cooper forfeited his challenges regarding "in a
      telephone" and "identification card account" .................59

VI.    GUTMAN ALSO ANTICIPATES THE CLAIMS AT ISSUE
       FROM THE '875 PATENT UNDER THE CORRECT
       CONSTRUCTION OF "A TELEPHONE" .......................................61

VII.   THE COURT SHOULD NOT CONSIDER COOPER'S
       ARGUMENTS CHALLENGING THE CONSTITUTIONALITY
       OF *INTER PARTES* REVIEW ............................................65

       A.    Cooper forfeited his constitutional arguments by failing to
             present them to the Board ........................................65

       B.    Even If the Court Were To Consider Cooper's Forfeited
             Argument, It Should Affirm the Board's Decision
             Following *MCM Portfolio* ........................................68

             1.    *Inter* Partes Review Is Consistent With Article III ........69

             2.    *Inter Partes* Review Is Consistent With the Seventh
                   Amendment ....................................................74

CONCLUSION ....................................................................77

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
406 F.3d 1365 (Fed. Cir. 2005) ....................................................................28

*Artuz v. Bennet*,
531 U.S. 4 (2000).........................................................................................78

*Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*,
430 U.S. 442 (1977).............................................................................75, 76

*B&B Hardware, Inc. v. Hargis Indus., Inc.*,
135 S. Ct. 1293 (2015).........................................................................75, 77

*Badaracco v. Commissioner*,
464 U.S. 389 (1984).....................................................................................78

*Belden Inc. v. Berk-Tek LLC*,
610 F. App'x 997 (Fed. Cir. Apr. 17, 2015).................................................18

*Blakely v. Comm'r of Social Security*,
581 F.3d 399 (6th Cir. 2009) .......................................................................30

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989).....................................................................................72

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966).............................................................................18, 30

*Cooper v. Lee*,
86 F. Supp. 3d 480, 486 (E.D. Va. 2015) .............................................68, 69

*Crowell v. Benson*,
285 U.S. 22 (1932).......................................................................................71

*Curtis v. Loether*,
415 U.S. 189 (1974)) .............................................................................75, 76

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009) ...................................................................53

*Elekta Instrument SA v. O.U.R. Sci. Int'l, Inc.*,
    214 F.3d 1302 (Fed. Cir. 2000) ........................................................22

*Epistar Corp. v. Int'l Trade Comm'n*,
    566 F.3d 1321 (Fed. Cir. 2009) ........................................................20

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989)................................................................71, 73, 77

*Harari v. Lee*,
    656 F.3d 1331 (Fed. Cir. 2011) ........................................................65

*Hoganas AB v. Dresser Indus., Inc.*,
    9 F.2d 948 (Fed. Cir. 1993) ..............................................................24

*In re Am. Acad. of Sci. Tech. Ctr.*,
    367 F.3d 1359 (Fed. Cir. 2004) ........................................................18

*In re Applied Materials, Inc.*,
    692 F.3d 1289 (Fed. Cir. 2012) ..................................................18, 29

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) ....................................15, 17, 18, 53

*In re Gleave*,
    560 F.3d 1331 (Fed. Cir. 2009) ........................................................17

*In re Gustafson*,
    331 F.2d 905 (C.C.P.A. 1964) ....................................................50, 51

*In re Inland Steel Co.*,
    265 F.3d 1354 (Fed. Cir. 2001) ........................................................30

*In re Lockwood*,
    50 F.3d 966 (Fed. Cir. 1995) ............................................................76

*In re Rambus*,
    694 F.3d 42 (Fed. Cir. 2012) ............................................................18

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ........................................................19

*Iron Silver Mining Co. v. Campbell*,
  135 U.S. 286 (1890) ........................................................................74

*Kos Pharms., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ...........................................................24

*Krippelz v. Ford Motor Co.*,
  667 F.3d 1261 (Fed. Cir. 2012) ......................................................27

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996)...................................................................19, 76

*Max Sound. Corp. v. Google, Inc.*,
  No. 14-cv-4412-EJD, slip op. (N.D. Cal. May 13, 2015) .................24

*McCormick Harvesting Mach. Co. v. Aultman*,
  169 U.S. 606 (1898)...................................................................73, 74

*McKart v. United States*,
  395 U.S. 185 (1969)........................................................................68

*MCM Portfolio LLC v. Hewlett-Packard Co.*,
  __ F.3d __, 2015 WL 7755665 (Fed. Cir. Dec. 2, 2015) .........................*passim*

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005) ......................................................22

*Mesta Mach. Co. v. Federal Mach. & Welder Co.*,
  110 F.2d 479 (3d. Cir. 1940) ..........................................................50

*Milwaukee Elec. Tool Corp. v. Hilti, Inc.*,
  2015 WL 5795519 (E.D. Wis. Oct. 2, 2015)....................................68

*Moore v. Robbins*,
  96 U.S. 530 (1877)..........................................................................74

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
  59 U.S. 272 (1855)..........................................................................70

*MySpace, Inc. v. GraphOn Corp.*,
  672 F.3d 1250 (Fed. Cir. 2012) ......................................................19

*Palladian Partners, Inc. v. United States*,
   783 F.3d 1243 (Fed. Cir. 2015) ............................................................36, 66, 68

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ..................................................................18, 19

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806 (1945)..........................................................................................72

*Sears, Roebuck & Co. v. Stiffel Co.*,
   376 U.S. 225 (1964)....................................................................................72, 74

*Smith & Nephew, Inc. v. Rea*,
   721 F.3d 1371 (Fed. Cir. 2013) .......................................................................18

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
   897 F.2d 511 (Fed. Cir. 1990) .........................................................................24

*Stern v. Marshall*,
   131 S. Ct. 2594 (2011).............................................................................*passim*

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015)..........................................................................18, 72, 75

*Thomas v. Union Carbide Agric. Prods. Co.*,
   473 U.S. 568 (1985)) .......................................................................................77

*Tull v. United States*,
   481 U.S. 412 (1987)..........................................................................................75

*United States v. Am. Bell Tel. Co.*,
   128 U.S. 315 (1888)....................................................................................73, 74

*United States v. Stone*,
   69 U.S. 525 (1864)...........................................................................................74

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) .........................................................................19

*Woodford v. Ngo*,
   548 U.S. 81 (2006)....................................................................................36, 66

**Statutes**

35 U.S.C. § 103 ................................................................50, 51

35 U.S.C. § 144 ....................................................................24

35 U.S.C. § 316(a) ...............................................................67

35 U.S.C. § 318(b) ...............................................................78

**Rules**

37 C.F.R. § 42.22 .................................................................67

37 C.F.R. § 42.23 .................................................................36

77 Fed. Reg. 48756 .........................................................36, 67

77 Fed. Reg. 48766 .........................................................36, 67

**Other Authorities**

Robert L. Harmon et al., PATENTS AND THE FEDERAL CIRCUIT 206-07
    (12th ed. 2015) ...........................................................51, 52

*Wiley Electrical and Electronics Engineering Dictionary* ...............................63, 64

13 *Writings of Thomas Jefferson* 335 (Memorial ed. 1904) ...................................72

# **TABLE OF ABBREVIATIONS**

## *Parties*

| | |
|---|---|
| Board | Patent Trial and Appeal Board |
| Cooper | J. Carl Cooper, Patent Owner-Appellant |
| Square | Square, Inc., Petitioner-Appellee |
| USPTO | United States Patent and Trademark Office |

## *Terms*

| | |
|---|---|
| '005 Patent | U.S. Patent No. 6,764,005, the first patent-at-issue on appeal (A 0163-71) |
| '207 Patent | U.S. Patent No. 7,828,207, the second patent-at-issue on appeal (A1920-28) |
| '875 Patent | U.S. Patent No. 8,490,875, the third patent-at-issue on appeal (A3565-75) |
| Patents | Collectively, the '005 Patent, the '207 Patent, and the '875 Patent |
| Kikinis | U.S. Patent No. 5,835,732 to Kikinis (A4037-4067) |
| Pitroda | U.S. Patent No. 5,590,038 to Pitroda (A0373-0403) |
| Gutman | U.S. Patent No. 5,221,838 to Gutman (A4068-4095) |
| OB | Cooper's November 2, 2015 Opening Brief in Appeal Nos. 2015-1925, -1942 & -1943 |

## INTRODUCTORY STATEMENT

In this consolidated appeal—from three IPR Final Written Decisions the Board issued in May 2015—Cooper challenges the Board's findings that two prior art patents (Pitroda and Kikinis) collectively anticipate the claims at issue.  OB2.  Anticipation is a question of fact.  This Court reviews the Board's factual findings with deference, asking only if substantial evidence supports them.  The administrative record supports the Board's findings.  On appeal, Cooper simply repeats the arguments the Board carefully considered, but rejected, as inconsistent with the record as a whole.  Accordingly, Cooper cannot show—as he must—that no reasonable mind could have reached the Board's conclusions.

Cooper also challenges certain claim constructions.  Most of those challenges are not properly before this Court because Cooper failed to raise them in his Patent Owner Response.  The Court can, and should, decline to consider them.  If it does consider them, the Court will see that Cooper wrongly seeks to import limitations from the specification and advocates constructions contrary to the intrinsic record.  The Court should reject Cooper's proposed constructions.

Finally, Cooper argues that *Inter Partes* Review violates Article III and the Seventh Amendment.  Once again, Cooper forfeited those arguments when he chose not to raise them in his Patent Owner Response.  If the Court chooses to consider them, it can summarily reject them, because they are identical to those the

Court found incorrect in *MCM Portfolio LLC v. Hewlett-Packard Co.*, __ F.3d __, 2015 WL 7755665 (Fed. Cir. Dec. 2, 2015).

## COUNTERSTATEMENT OF THE ISSUES

1.    Does substantial evidence support the Board's conclusion that Pitroda anticipates claims 1-6 of the '005 Patent and claims 1 and 8-14 of the '207 Patent?

2.    Does substantial evidence support the Board's conclusion that Kikinis anticipates claims 1-7, 9-13, 25-31, 33 and 34 of the '875 Patent?

3.    Should the Court affirm the Board's ruling that claims 1-7, 9-13, 25-31, 33, and 34 of the '875 Patent are unpatentable on the alternative ground that Gutman anticipates those claims?

4.    Has Cooper forfeited his constitutional challenges to *Inter Partes* Review, and if not, is such review consistent with Article III and the Seventh Amendment under *MCM Portfolio*?

## COUNTERSTATEMENT OF THE FACTS

## I.    THE PATENTS

The three Patents describe a "universal credit card" or "multi-card."  A0166 at 1:1-2, 2:50-51; A1923 at 1:1-2, 2:54-55; A3570 at 1:1-2, 2:60-61.  Their common specification[1] identifies the elements of the multi-card that were well

---

[1] The only difference between the specifications is Figure 8 to the '875 Patent and the text citing to it.  Figure 8 is a simple block diagram showing the components of the multi-card in a telephone.   A3569.

known in the prior art and are non-inventive. For example, the specification explicitly states that most of the multi-card's elements are "well known and commonly found and utilized in the industry." A0167 at 3:56-57. The only purportedly "novel features" are certain "operations" for loading a pattern into a programmable magnetic strip and retrieving it. *Id.* at 3:46-53. Indeed, during prosecution, Cooper called the programmable strip—which is not recited in any of the claims on appeal—"an essential element of the present invention." A0292-93.

Unlike a conventional credit card, which encodes only one account's information, the multi-card stores account information for multiple credit cards. A user can therefore select from the stored cards and use the programmable magnetic strip to "reconstruct the spatial patterns from the data stored in the memory" for the selected card. A0166 at 2:13-18. The multi-card therefore allows the user to replace multiple conventional cards with just the multi-card. A0167 at 3:33-37.

Although the specification identifies the programmable strip as the point of novelty in the patents, it is not at issue in this appeal. The claims the Board found unpatentable *do not include it*. Instead, those claims recite only the elements the specification identifies as "well known and commonly found," such as an "emitter" and a display." *Id.* at 3:54-60.[2] Figure 2, reproduced below, shows the preferred

---

[2] In particular, the claims at issue recite a carrier, a memory for storing information, an emitter for transmitting information, a receiver for receiving information, a display for displaying information, a control circuit, a power source,

embodiment of the multi-card and identifies its purportedly novel programmable

magnetic strip and the other, "well[-]known" components:



A0164 at Fig. 2 (annotated).

As shown, the multi-card has a conventional plastic substrate 3 that mounts a

number of components, including a display 5, a power source 6, an emitter 7, a

receiver/sensor 8, and a key pad 9.  A0164; A0166 at 2:51-57.  The specification

describes these components expansively and again emphasizes that they were well-

known in the prior art.  For example, the specification recounts that display 5 may

be "any electro optical type such as LCD, LED, CRT, incandescent, fluorescent,

flip dot, etc.," or it may be any "electro mechanical type such as beeper, buzzer,

vibrator, etc."  A0167-68 at 4:64-5:1.  Likewise, "[p]ower source 6 may be any

well known power source . . . ."  A0168 at 5:6-10.  And "[e]mitter 7 may be the

---

an operator interface or designator, and/or a telephone.  *See* A0170-71 ('005 Patent
claims 1-6); A1927-28 ('207 Patent claims 1 and 8-14); A3574-75 ('875 Patent
claims 1-7, 9-13, 25-31, 33, and 34).  *See generally* OB Add. Part Two
(reproducing claims at issue).

preferred infrared LED, antenna, coil, transducer, or any other device capable of conveying information . . . to outside devices[.]" *Id*. at 5:11-14. Receiver 8 may be any "device capable of receiving information . . . from outside devices[.]" *Id.* at 5:14-17. Finally, key pad 9 is "any device capable of receiving and coupling operator input to the invention." *Id.* at 5:23-26.

The components identified in Figure 2 are also depicted in the "CARD" portion of Figure 3, reproduced below:



A0164 at Fig. 3; *see also* A0168 at 5:28-30, 5:34-35, 5:38-40, 5:44-45, 6:45-49 (explaining how the elements of Figure 2 correspond to the elements in Figure 3). Figure 3 also discloses a control circuit 11, which is at issue in this case, but likewise conventional. The specification says the control circuit is "preferred to be a microprocessor such as an Intel 80C31 or which may have internal ROM, [RAM] and nonvolatile [RAM] *as is known in the industry*[.]" A0167 at 4:2-5 (emphasis added).

For the '005 and '207 Patents, independent claim 1 and dependent claim 2 of the '005 Patent are representative:

1. A credit card for providing and receiving account data including account information from a host system, said credit card comprising:

a carrier having a planar surface;

a memory affixed to said carrier, for storing account data including account information for at least one account;

an emitter affixed to said carrier and programmed with account identifier information for transmitting account identifying information to said host system;

a receiver affixed to said carrier for receiving account data including account information from said host system;

a display affixed to said carrier for selectively displaying account information;

a control circuit affixed to said carrier and coupled to each of said memory, said display and said receiver, said control circuit causing account data including account information received by said receiver from the host system to be stored in said memory and causing said account information stored in said memory to appear on said display; and

a power source affixed to said carrier and coupled to at least one of said memory, said receiver, said emitter, said display and said control circuit;

whereby, the use of the credit card on the host system allows the emitter to identify an account to the host system, the receiver to receive the particular account data including account information from the host system, the control circuit to cause the particular account data including account information to be stored in the memory and to cause said account information, consisting of all or a portion of said account data, to appear on the display.

2. A credit card as in claim 1 further comprising an operator interface affixed to said carrier and connected to said control circuit, said operator interface operable by a user to select an account location in

said memory in which account data including account information received from the host system is to be stored;

whereby, the user of the credit card can select which, of the multiple accounts stored on the card, is to be the subject of the particular use and, as such, is to receive account data including account information from the host to be stored in memory and which account information is displayed on the display.

A0170 at 9:62-10:39.

The claims at issue from the '875 Patent differ slightly, in that they include one additional element: "a telephone." During prosecution of the '875 Patent, Cooper added a simple block diagram (Figure 8) that places the well-known components discussed above within a box labeled "TELEPHONE." A3569. He added Figure 8 in response to the examiner's objection that the existing drawings were insufficient. A3876. When he submitted the drawings, Cooper told the examiner that he was not adding any new disclosure, and the previously-identified "circuits" "could be telephones." A3889. And he took pains to emphasize that prior art telephones could implement the purported invention because they contained the claimed hardware elements. A3934-35.

The claims of the '875 patent, however, once again lack any reference to the programmable strip "essential" to the purported invention. A0292-93. Independent claim 1 of the '875 Patent is representative:

1. An apparatus comprising:

in a telephone:

7

a control circuit;

a memory coupled to the control circuit, the memory configured to store information related to at least one credit card account;

a designator for selecting the information from the memory;

a display coupled to the control circuit and configured to display at least part of the information upon selection of the designator; and

an emitter coupled to the control circuit and configured to transmit a signal relating to the information, the emitter comprising at least one of an antenna, coil, a transducer, the display, and an infrared LED.

A3574 at 9:59-10:7.  Claim 12 differs primarily by reciting an "identification card account" rather than a "credit card account[.]"  *Id.* at 10:28-42.[3]

## II.    THE PRIOR ART

The issues on appeal turn primarily on two[4] prior art references:  Pitroda (A0373-403) and Kikinis (A4037-67).  The other reference at issue is Gutman (A4068-95), which provides an alternative basis for affirming the Board's holding regarding the '875 Patent.  Cooper does not dispute that these references are prior art to the Patents.

---

[3] Claim 13 similarly recites "[a] telephone and credit card system" rather than an "apparatus" and recites that "a console configured to communicate with the control circuit and receive data to provide access to at least one of an account, a service, and a feature" must also be "in [the] telephone[.]"  A3574 at 10:43-60.

[4] The Board also held that independent claim 14 and dependent claims 16-21 and 23 of the '875 Patent are unpatentable over Gutman and U.S. Patent No. 5,276,311 ("Hennige").  Cooper does not appeal the Board's holding as to those claims. OB9.

### A.     Pitroda

Pitroda discloses a universal electronic transaction card ("UET card") "capable of serving as a number of different credit cards [and] bank cards . . . ." A0373 at Abstract. The UET card of Pitroda includes a carrier (Fig. 1), memory (RAM, ROM, non-volatile RAM 34), a micro controller, a display 30, an LED 35, and communication means, such as pin contacts 38 and an RF or IR option 39:



**FIG. 3**

A0377 at Fig. 1, Fig. 3 (emphasis added). Using the pin contacts or the wireless RF/IR options, the UET card "communicat[es] with central processing units or computers operated by the providers of services, such as credit card institutions,

banks, . . . retailers, wholesalers or other providers of goods or services." A0393 at

2:61-66.[5] For example, the UET card transmits account information for a selected

"service institution account" (*e.g.*, an American Express card) to a "service

institution system[]" (*e.g.*, the card issuer). A0395 at 6:16-36. After the

transaction is complete, the UET card receives transaction information, which it

stores "with respect to the service institution account." *See id.* at 6:33-43.

**B.    Kikinis**

Kikinis discloses a micro-PDA, or *μ*PDA 10, that is docked into a cellular

telephone 45:



Fig. 11

A4048 at Fig. 11; A4064 at 14:26-50. Kikinis further discloses a memory (*e.g.*,

memory 13 for storing "associated credit card numbers"), a designator (*e.g.*, touch-

---

[5] The UET card communicates with "a communication interface unit ('CIU')"
"either through physical metallic contact . . . or infra red or radio frequency based
wireless transmit and receive units," "depending on the system used by the UET
card." A0397 at 9:55-63.

sensitive input 27 or thumbwheel for using, accessing, and selecting stored information), a display (display 25), and an emitter (*e.g.*, "optional equipment" 19 that may include an IR and/or RF interface, such as an antenna, for sending credit card information with a call):



Fig. 3

A4040 at Fig. 3 (emphasis added); *see also, e.g.*, A4050 at Fig. 13 (depicting IR interface on $\mu$PDA); A4065 at 16:7-11 (describing infrared communication between $\mu$PDA and host computer); A4064 at 14:26-50 (disclosing transmitting credit card data over a cellular antenna).

### C.    Gutman

Gutman discloses an electronic wallet 100 capable of storing "at least one of the financial information and a balance" related to multiple financial accounts. A4252-4303; *see also, e.g.*, A4069 at Fig.1; A4068 at Abstract; A4084 at 1:14-15; A4085 at 4:36-68.  Gutman further discloses:  a control circuit (Controller 205); a memory (Memory 206 and/or Non-Volatile Memory 207 for storing financial information from multiple cards); a designator (Input Controls 209); a display (Display 108); and an emitter (Antenna 202 to transmit an encoded or nonencoded account balance).



A4070 at Fig. 2A; A4252-4259.

Regarding telephone components, Gutman discloses a telephone line interface 230, a modem 232, and a dual tone multi-frequency transceiver 234:



*FIG. 2B*

A4070 at Fig. 2B; A4088 at 9:10-26.  Gutman also incorporates by reference U.S. Patent No. 4,831,647 ("D'Avello").  A4086 at 5:59-65.  D'Avello discloses a telephone that uses telephone functions to communicate credit card information. *See, e.g.*, A4096 at Abstract; A4101 at Fig.5.

## III.  PROCEDURAL HISTORY OF COOPER'S CONSTITUTIONAL ARGUMENTS

The Board entered a scheduling order in each of the instituted IPRs.  The scheduling orders warned Cooper that arguments "not raised in the [Patent Owner] Response would be deemed waived."  A1856; A3495; A5309.  Cooper did not, however, raise any constitutional challenges to the Board's proceedings in his Patent Owner Responses.  A1033-51; A2684-2704; A4509-38.  Instead, just before oral argument, Cooper filed a paper indicating that he intended "to argue certain

issues at oral argument on January 9, 2015." A5332-33. In particular, Cooper stated that he intended to argue the constitutional challenges raised in his Preliminary Response, but not his Patent Owner Response. A1804. The Board expunged that notice as unauthorized. *Id*.; A5332-33. The Board also precluded Cooper from arguing the constitutional challenges he failed to include in his Patent Owner Response because there was not sufficient notice to Square or to the Board. A1805-06.

## SUMMARY OF THE ARGUMENT

**'005 and '207 Patents.** Substantial evidence supports the Board's conclusion that Pitroda anticipates the claims at issue from the '005 and '207 Patents. The Board carefully considered Pitroda's disclosures, the testimony of both experts, and the factual record as a whole. The Board correctly concluded that Pitroda discloses every element of the challenged claims. Regarding the "emitter," the Board properly concluded that Pitroda discloses an emitter that transmits credit card information through both wired and wireless connections. Regarding the "control circuit," Pitroda discloses a microprocessor that stores account information in memory, which is all the claims require. Regarding the "operator interface" and "account identifier," Pitroda satisfies the limitations because it teaches that the user can select a particular credit card account for a transaction—and for storing data regarding that transaction—in memory

"corresponding to each card." Pitroda therefore discloses the elements of the '005 and '207 Patents that Cooper wrongly contends it lacks.

Cooper also challenges the Board's construction of "emitter," contending that the claimed emitter must communicate wirelessly. That construction, however, is contrary to the language of the claims, contradicts Cooper's own admissions, and requires this Court to import a limitation from the specification.

**'875 Patent.** Substantial evidence supports the Board's conclusion that Kikinis anticipates the claims at issue from the '875 Patent. Cooper challenges the Board's findings that Kikinis discloses the claimed "emitter," "display," and "memory." Cooper's challenges, however, are nothing more than a rehash of the factual arguments he presented to the Board. The Board justifiably rejected those arguments as inconsistent with record as a whole. Cooper also challenges the Board's findings that Kikinis discloses the claimed elements "in a telephone" and the storage of information regarding an "identification card account." Cooper has forfeited those challenges, however, because he did not raise them in his Patent Owner Response. Even if he had, the Board's finding that Kikinis discloses those elements is well supported. Cooper cannot show that no "reasonable mind" would have reached the Board's conclusions. *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000).

Cooper also raises three claim construction arguments, but they are not properly before the Court because he failed to raise them in his Patent Owner Response. If the Court does decide to construe those claims, it should reject Cooper's proposed constructions. Cooper argues that "emitter" should be limited to devices that transmit information "outside the device," OB25-27, but that construction is inconsistent with other claim language. Cooper next argues that the term "in," within the term "in a telephone," requires a "combination" of elements rather than "juxtaposition." OB27-29. That argument rests on an unworkable distinction between "combinations" and "juxtapositions" that Congress and the courts rightly abandoned more than 50 years ago. Cooper also argues that "identification card account" should be construed to exclude any overlap with "credit card," OB29-30, but that construction is contrary to the intrinsic evidence and this Court's opinions.

Finally, if the Court decides that Kikinis does not anticipate the claims at issue from the '875 Patent, it can affirm on the alternative ground that Gutman anticipates those claims. The Board held that Gutman anticipates all instituted claims that do not recite "a telephone." A0068-72. (The Board held that Gutman does not anticipate the other claims because it lacks "a telephone"). That conclusion is wrong for two reasons. First, the Board mistakenly construed "telephone" as requiring "a microphone and a speaker." A0057. The plain and

ordinary meaning of "telephone"—as confirmed by the intrinsic and extrinsic evidence—is not limited to devices with those components. It encompasses any device that uses wired or wireless telephony. As the Board acknowledged, Gutman discloses telephonic capabilities. A4458. Its circuitry includes telephone interface circuitry 230, modem 232, and Dual Tone Multi-Frequency transceiver 234, allowing Gutman's invention to "dial a telephone number" for a computer system to communicate credit card data with institutions via, for example, a Public Switch Telephone Network (PSTN). A4827; *see also* A4088 at 9:10-22, 9:45-52; A4071 (Fig.3). Thus, Gutman discloses a telephone. Second, even if the Board's construction of "telephone" were correct, Gutman *does* disclose a telephone with a microphone and speaker. Thus, Gutman anticipates all claims of the '875 Patent, not just those without the "telephone" limitation.

**Cooper's Forfeited Constitutional Challenges.** Cooper forfeited his challenges by failing to raise them timely. If the Court considers them, it can summarily reject them in light of *MCM Portfolio*, __ F.3d __, 2015 WL 7755665 at *1.

## STANDARDS OF REVIEW

Anticipation is a question of fact, and this Court reviews the Board's factual findings for substantial evidence. *In re Gleave*, 560 F.3d 1331, 1334-35 (Fed. Cir. 2009); *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000). This standard

"requires a deferential approach to the Board's findings." *Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371, 1380 (Fed. Cir. 2013). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Gartside*, 203 F.3d at 1312 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is "something less than the weight of the evidence but more than a mere scintilla of evidence." *In re Gartside*, 203 F.3d at 1312. "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).

This Court reviews the Board's legal conclusions de novo. *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1363 (Fed. Cir. 2004). Claim construction is a legal question, reviewed de novo. *Id.* at 1363. For claim constructions that involve factual underpinnings, however, those facts are reviewed for substantial evidence. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 835 (2015); *Belden Inc. v. Berk-Tek LLC*, 610 F. App'x 997, 1002 (Fed. Cir. Apr. 17, 2015).

Although the Board typically gives claims their broadest reasonable interpretation, the patents at issue have all expired. The Board therefore was required to (and did) construe them pursuant to the standards set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). *See In re Rambus*, *Inc.*, 694 F.3d 42,

46 (Fed. Cir. 2012). Under *Phillips*, claim terms are given "the ordinary and customary meaning of the claim language itself in the context of the written description of the invention found in the patent, and the prosecution history." *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1255 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1312-13).

Limitations from the written description, however, are not elements of the claims absent a clear intention by the patentee to incorporate them. *Id.* at 1255-56. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). According to this fundamental principle, "[t]he written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." *Id.* (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc)). Instead, a court should "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

When analyzing the role of the specification in ascertaining the meaning of a patent's claims, "the words of a claim 'are generally given their ordinary and customary meaning.'" *Id.* at 1312-13 (quoting *Vitronics*, 90 F.3d at 1582). There

is a "heavy presumption" that claim terms are not limited to specific embodiments disclosed in the specification. *See Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009).

## ARGUMENT

## IV. THE BOARD PROPERLY CONCLUDED THAT PITRODA ANTICIPATES THE CLAIMS AT ISSUE FROM THE '005 AND '207 PATENTS

The Board carefully considered Pitroda's disclosures, and the expert testimony of Dreifus, and it correctly concluded that Pitroda discloses every element of the challenged claims. Cooper raises a host of challenges to the Board's conclusions, but they all fall flat. First, Cooper contends that the Board misconstrued the term "emitter." OB19-25. Cooper argues an "emitter" must communicate wirelessly, but that construction is contrary to the language of the claims, contradicts Cooper's own admissions, and requires this Court to import a limitation from the specification. (Moreover, Cooper's arguments are largely irrelevant because Pitroda discloses both a wired and wireless emitter.)

Second, Cooper wrongly argues that the Board lacked substantial evidence for its conclusion that Pitroda discloses the claimed "emitter," "control circuit," "operator interface," and "account identifier." OB34-49. Cooper faces a heavy burden in challenging the Board's factual findings, and he comes nowhere near satisfying it.

### A.    The Board correctly construed "emitter" ('005 Patent, claims 1-6; '207 Patent claims 1 & 8-14)

Based on the claim language, and the "broad language of the Specification with respect to emitters," A0033, the Board construed "emitter" as "a device that transmits a signal conveying information to another device, and that is recognizable to one of ordinary skill in the art as an emitter."  A0007; A0032. Cooper argues that the Board erred because the claimed emitter must transmit a signal "wirelessly."  OB19-25.  Cooper is mistaken.  His construction is contrary to the specification, renders superfluous the claim term "wirelessly" (which appears in certain claims and is absent in others), and contradicts Cooper's own testimony. This Court should reject it.

The specification refutes Cooper's proposed construction.  As the Board correctly noted, the "broad language of the Specification with respect to emitters" does not limit them to wireless transmission.  A0033.  To the contrary, and as the Board emphasized, the specification provides that "[e]mitter 7 may be the preferred infrared LED, antenna, coil, transducer, or *any other device capable of conveying information* to outside devices."  A0008 (quoting and emphasizing A0168 at 5:11-14).  Far from limiting "emitter" as Cooper alleges, this expansive language broadly encompasses any form of conveyance of information, whether wired or wireless.  And to the extent Cooper suggests that the word "emit"

21

inherently requires wireless communications, he is wrong.  A1338; A1676 ("[E]mit" is defined simply as "to send out.").

Cooper's proposed construction is doubly wrong, because it renders certain claim language superfluous.  The Board properly noted that certain claims—*i.e.* those that teach an emitter for "wirelessly transmitting" information—use the term "wirelessly" as "narrowing, qualifying language."  A0033.  Limiting "emitter" as Cooper proposes would impermissibly nullify that qualifying language. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (rejecting a construction that would "render[] other parts of the claim superfluous"); *Elekta Instrument SA v. O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) (finding the district court's broad construction to be erroneous because it "renders the reference to [the claim term] superfluous.").

Finally, the Court should reject Cooper's construction because it is contrary to his own testimony.  The claimed emitter performs a basic function.  It is "programmed with account identifier information for transmitting account identifying information to [the] host system."  A1928 at 11:12-14.  When asked whether "transmission of information . . . include[s] wired and wireless communication?," A1561:16-18, Cooper responded:  "Yeah, information can be transmitted by wires or wirelessly."  A1561:21-22.  By Cooper's own admission,

the function of the claimed emitter—to transmit information—can be performed by a wired or wireless connection.

Against this extensive evidence, Cooper offers only: (1) an unwarranted reading of the Notice of Allowability from the prosecution history of the '207 Patent (which the Board correctly rejected (*see* A0036-37)); and (2) new evidence he failed to present to the Board. Neither supports his proposed construction. Regarding the '207 prosecution history, Cooper relies on the Examiner's statement that the prior art does not teach, among other things, an "emitter device affixed to the carrier for transmitting account information wirelessly[.]" A2544. There is no evidence that the Examiner was construing the term "emitter" in that sentence. Instead, it appears that he was merely quoting the functional language of claim 1.

Even if the Examiner mistakenly believed that all of the claims of the '207 Patent required wireless communications, that is not evidence of how he construed the term "emitter." At best, it would mean that he agreed with Cooper's contention that the emitter devices listed in claims 8 and 13—"infrared LEDs, coils, antenna and transducers"—consist solely of wireless devices. OB20-21. If so, the Examiner's statement is based on claim terms *other* than emitter: the term "wirelessly" in claims 1 and 14; and the list of possible emitters in claims 8 and 13. It has nothing to do with construction of the term "emitter."

Cooper's second piece of evidence—from the '094 Patent prosecution history—likewise fails to undercut the Board's construction. In fact, it is not even properly before this Court. Cooper concedes that he failed to present this evidence to the Board. OB23 (admitting that "neither party placed the '094 Patent prosecution history into the PTAB record"). Cooper may not rely on evidence absent from the administrative record below. 35 U.S.C. § 144 ("The . . . Federal Circuit shall review the decision from which an appeal is taken *on the record before the Patent and Trademark Office.*") (emphasis added).

Even if this Court was charged with reviewing new evidence, it should not take "judicial notice" of arguments Cooper made to the Patent Examiner and the purported importance of those arguments. *See, e.g.*, *Max Sound. Corp. v. Google, Inc.*, No. 14-cv-4412-EJD, slip op. at 6 (N.D. Cal. May 13, 2015) ("While the Court takes judicial notice of the existence of the prosecution history, it declines to take judicial notice of Defendants' interpretation of the documents."). Cooper cites various cases for the proposition that this Court may take judicial notice of prosecution history, but those cases allow judicial notice only of indisputable adjudicative facts. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 705 n.5 (3d Cir. 2004) (judicial notice of date of Notice of Allowance); *Hoganas AB v. Dresser Indus., Inc.*, 9 F.2d 948, 954 & n.27 (Fed. Cir. 1993) (judicial notice that one patent was "art of record" for another); *cf. Standard Havens Prods., Inc. v.*

*Gencor Indus., Inc.*, 897 F.2d 511, 514 & n.3 (Fed. Cir. 1990) (noting the "adjudicative fact" of the date of an office action rejection, but expressly not relying on it).

Here, unlike the cases Cooper cites, Square disputes the meaning of the prosecution history that Cooper belatedly raises.  Square contends, for instance, that the excerpts Cooper cites *support* the Board's construction.  The examiner initially rejected claim 36 (which recited "emitter" without either the word "wirelessly" or the group of purportedly wireless devices) in part because "Nagata teaches . . . [that] *the [wired] input/output terminal serves as an emitter*/receiver device . . . as shown in figure 7[.]"[6]  Cooper therefore amended claim 36 to add a group of devices he contends are wireless *and only then* asserted that Nagata is distinguishable because it "require[s] some type of physical contact with the device[.]"  U.S. Patent App. No. 10/857,031, 2005-10-20 Amendment at 2, 11.  In other words, the examiner *understood* that "emitter," standing alone, encompasses both wired and wireless communication.  Cooper acquiesced to this view, adding qualifying language (*i.e.* a list of devices Cooper insisted were wireless)[7] to

---

[6] U.S. Patent App. No. 10/857,031, 2005-08-10 Final Rejection at 3 (emphasis added).  Figure 7 of Nagata, among other disclosure, shows a *wired* connection. *See* U.S. Patent No. 5,140,517 ("Nagata"), Fig. 7 elt.522 ("INSERT IC CARD").

[7] The '094 file history cited by Cooper includes Cooper's contention that the claimed group of devices use "transmission that is absent of physical contact," which is synonymous with "wireless."  OB24.

overcome the rejection.  At no point did Cooper argue that "emitter" alone meant wireless communication.   In sum, the Court should not consider the '094 prosecution history, but if it does, it should find that the history supports the Board's construction of "emitter."   The Board's construction of "emitter" is correct, and the Court should affirm it.

### B.    Substantial evidence supports the Board's factual findings

#### 1.    Substantial evidence supports the Board's finding that Pitroda discloses an "emitter" ('005 Patent, claims 1-6; '207 Patent claims 1 & 8-14)

Cooper contends that Pitroda lacks an "emitter" because it does not disclose "wireless transmission of account identifying information."   OB34.   Cooper acknowledges, however, that Pitroda's UET card can communicate wirelessly.  *Id.* (noting the UET card's "IR or RF option 39.").   Indeed, Cooper does not dispute the Board's holding that "Pitroda's IR/RF option is provided as an alternative means of communication[.]"   A0013; A0037 (citing A0397 at 9:55-59).   Cooper also admits that Pitroda explicitly discloses that the UET card can transmit credit card data, which is account identifying information.   OB32 (referring to Pitroda's "disclosure of such information being 'emitted' us[ing] mechanical contacts").   Cooper's sole argument is that Pitroda insufficiently discloses the *wireless* transmission "***of credit card information***" in the wireless embodiment.   OB35 (emphasis in original).   Cooper is mistaken.

As an initial matter, Cooper does not dispute that Pitroda discloses the "emitter" in claims that cover wired communications. OB34, 37.[8] Thus, if the Court affirms the Board's construction of "emitter," then Cooper's arguments with respect to claims 1 and 5 of the '005 Patent fail because Cooper acknowledges that Pitroda's UET card transmits credit card data over wired communications.[9]

Cooper's arguments also fail for the claims that require wireless communications, such as claims 1 and 14 of the '207 Patent. As noted above, Cooper acknowledges that Pitroda's UET card does transmit credit card information, and he agrees that the "IR/RF option is provided as an alternative means of communication of the information required to be communicated." *Supra* p. 26. That language, standing alone, is substantial evidence that Pitroda's UET card transmits credit card information wirelessly. *See Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1268 (Fed. Cir. 2012) (holding that the challenged claims were anticipated because an alternative embodiment taught the claim language); *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1372 (Fed. Cir. 2005) (same).

---

[8] As the Board noted, Cooper admitted in his Patent Owner Response that "[t]he metal contacts of Pitroda transmit credit card information outside of the UET card[.]" A0013, *quoting* A1042 ("the only complete disclosure of any credit card information being transmitted outside the unit exists at [A0400 at] 16:35-41").

[9] The same is true if the Court determines that the transducer of claims 8 and 13 need not be wireless.

Pitroda goes further, however, and discloses that the UET card interfaces with a separate Communications Interface Unit ("CIU") "either through physical metallic contact . . . *or infra red or radio frequency [IR/RF] based wireless transmit and receive units*." A0397 at 9:55-59 (emphasis added). Pitroda additionally explains that "[t]he CIU includes means for receiving data from the UET card, such as metal contacts . . . *or* infrared or radio frequency [IR/RF] based wireless systems, *depending on the system used by the UET card*." *Id.* at 9:59-63 (emphasis added). And, as mentioned, Cooper does not dispute that the UET card provides the CIU with credit card information, *e.g.* "information . . . regarding the user's American Express account, such as . . . the American Express account number[.]" A0400 at 16:37-41. Because Pitroda discloses that the UET card's communications to the CIU can be wired or wireless, and the UET card transmits credit card information to the CIU, it discloses wireless communication of credit card data. The Board's conclusion is supported by substantial evidence.

Attempting to undermine the Board's holding, Cooper wrongly contends that the Board ignored "fatal admissions" from Square's expert Dreifus. OB35-36. First, Dreifus's testimony contains no admissions that undercut his opinions. He testified only that the particular columns and lines of Pitroda that he was directed to review do not state that the UET card transmits credit card information wirelessly. A1229:4-6 (directing Dreifus to consider only Figure 3 element 39 and

"Column 9, lines 59 through 62 and column 11, lines 25 and 26"). The Board placed this testimony in context and correctly concluded that it was fully consistent with Dreifus's opinions. Dreifus opined, and the Board agreed, that other portions of Pitroda disclose—to one of ordinary skill in the art—wireless transmission of credit card information. *See* A0012 (citing relevant portions of Dreifus's declaration); A00037 (same); *see also, e.g.*, A0450-52 (declaration testimony of Dreifus that Pitroda discloses wired and wireless disclosure of credit card information).

Second, the Board did not ignore this testimony from Dreifus. The Board explicitly cited and considered the portions of Cooper's brief that relied on that testimony. A0011 (citing portions of Patent Owner Response where Cooper relied on that testimony); A0036 (same). The Board simply disagreed with Cooper as to the meaning of that testimony.

Cooper dislikes the Board's conclusion, and he believes that the record would support a different conclusion. That is not enough to overturn the Board's decision. As this Court has held, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "'The substantial-evidence standard . . . presupposes that there

is a zone of choice within which the decisionmakers can go either way, without interference by the courts. . . . Therefore, if substantial evidence supports the [Board's] decision, the Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakely v. Comm'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009) (internal citations omitted).

Finally, Cooper makes arguments about inherency, but they are a red herring. Based on the evidence above, the Board properly concluded that Pitroda *expressly* discloses wireless transmission of credit card information. A0013 ("The use of either metal contact option or IR/RF option as an emitter is disclosed explicitly in Pitroda, and not merely a possibility or probability."); A0037 ("The use of the IR/RF option as an emitter is disclosed explicitly in Pitroda, and not merely a possibility or probability"); *see also In re Inland Steel Co.,* 265 F.3d 1354, 1360-61 (Fed. Cir. 2001) (holding that a reference must be considered for all that it discloses, including all its embodiments). The Board's conclusion that Pitroda discloses the "emitter" limitation is supported by substantial evidence.

### 2. Substantial evidence supports the Board's finding that Pitroda discloses a "control circuit" ('005 Patent, claims 1-6; '207 Patent claims 1 & 8-14)

Contrary to Cooper's arguments, Pitroda discloses a "control circuit" that directs storage of account data into memory. Claims 1, 8, 13, and 14 of the '207

Patent and claims 1 and 5 of the '005 Patent all require a "control circuit[.]"  A170 at 10:9-15; A171 at 11:10-18; A1927 at 10:7-13; A1928 at 11:22-28, 12:24-30 & 12:52-58.  The '207 Patent claims recite that the control circuit "is operable to store account data including account information."  A1927 at 10:8-9.  The '005 Patent similarly recites in claim 1 a "control circuit causing account data including account information . . . to be stored in said memory[.]"  A170 at 10:10-13.  Claim 5 of the '005 Patent has a similar, but lesser requirement, stating only that the control circuit must be "electrically connected to said memory means[.]"  A171 at 11:15-16.

Cooper does not deny that Pitroda's microcontroller is capable of performing the "control circuit" functions claimed in the '005 and '207 Patents. Instead, Cooper argues that Pitroda's microcontroller is always bypassed.  He bases that argument on the disclosure that—in one embodiment—the UET card has "a non-volatile RAM 34 and or touch memories with direct contact to connect to the CIU," A0398 at 11:21-23, and the disclosure that the CIU has "CARD INFO. WRITE" software (A0380).  From this evidence, Cooper makes the unjustified leap that the CIU alone stores account data.  OB38-42.  The Board considered those arguments at length but concluded that—based on the many disclosures in the specification to the contrary and Dreifus's testimony—a person of ordinary skill would understand that Pitroda's microcontroller *does* cause account

information "to be stored in the memory." A0017; A0041. Substantial evidence supports the Board's conclusion.

The Board relied on Pitroda's numerous disclosures that the UET card stores account data in memory as claimed. The Board recounted that Figure 3 (A0377) shows a direct connection between Pitroda's microcontroller 33 and non-volatile RAM 34. A0016-17; A0040-41. This connection, the Board concluded, allows the microcontroller to write account data to the memory. In reaching its conclusion, the Board relied on multiple disclosures in which the UET card's controller, rather than the CIU, writes to the memory. A0015-17; A0039-41. For example, the Board noted that "the UET card of the present invention may be used to store in memory each credit card or bank transaction for which it is used." A0396 at 7:33-35; A0039; A0015. The Board likewise relied on the disclosures describing the memory management and database management functions performed by the UET card's software (run by the microcontroller), including managing "credit card account information" on each card. A0398 at 11:40-12:6; A0015; A0039.[10] The Board further relied on the disclosure that "the UET Card

---

[10] Cooper cites a portion of this disclosure, A0398 at 12:1-4, and he argues that it does not show that the microcontroller uses software to write account data to memory. OB40. His argument ignores the surrounding paragraphs. They disclose that memory area 410 appears in "a diagram of the *major software blocks* which may be used in the UET card" and is part of the discussion of the *UET card's* software. A0398 at 11:40-12:34 (emphasis added). In context, a person of ordinary skill in the art would understand that the UET card's "major software

software also includes . . . memory management 413, database management 414[.]" A0398 at 12:7-12; A0016; A0040. In addition, the Board cited and relied upon Pitroda's explicit disclosures that "information stored, transmitted, or received *by the UET card* may include . . . account information for each service institution." A0394 at 3:4-22 (emphasis added); A0016; A0040; *see also* A0393 at 2:50-61 (The UET card "is capable of storing personal information[.]"); A0016 (relying on 2:50-61); A0050 (same).

The Board relied not only on its own reading of the Pitroda's disclosures, but also the testimony of Square's expert. He explained that one of ordinary skill in the art would conclude that "the microcontroller of Pitroda perform[s] the memory storage for account information[.]" A0016, A0040 (citing the evidence on which Dreifus relied); A0017, A0041 (relying on Square's expert).

Cooper tries to downplay this substantial evidence by arguing that it shows only that the UET card passively contains information the CIU stored in memory. OB40. Cooper is mistaken. The language cited above shows, for example, that the UET card—independent of the CIU—stores, transmits, and receives account data.[11] And Dreifus confirmed that to one of ordinary skill in the art, the

---

blocks" cause the microcontroller to save account data to memory. A1208-16; A2861-69; *see also* A0016-17; A0040-41.

[11] Again, Cooper's argument rests on the somewhat ambiguous disclosure that, in one embodiment, non-volatile RAM 34 or touch memory is described as in "direct

disclosures above teach a UET card's microcontroller can and does store account data. A0016-17; A0040-41. Moreover, Cooper largely ignores two additional disclosures within Pitroda that the Board relied on and that are fatal to his argument. First, the Board noted that Pitroda discloses that "information entering the UET card via . . . IR/RF option 39 would be managed by microcontroller 33[.]" A0017; *see also* A0041. Based on this evidence—and the evidence discussed above—the Board properly concluded that the UET card's microcontroller causes the memory to store account data received wirelessly. A0040-41. Second, the Board relied on Pitroda's disclosure that the microcontroller can store information not only in non-volatile RAM 34, but also in RAM 33. A0016; A0039-41 (noting that "Patent Owner's assertion that there is agreement between the parties that account information only can be stored in non-volatile RAM 34 is unsupported by the record," and holding that the UET card's microcontroller can store account data in RAM 33). RAM 33 is *not* directly connected to the CIU in any embodiment, as the Board recognized. A0016-17; A0040-41. Thus, contrary to Cooper's argument, the microcontroller (and not the CIU)[12] stores data in RAM 33. This

---

contact to connect to the CIU." OB39 (citing A0398 at 11:21-23). That passage does not purport to limit the other disclosures discussed in this section.

[12] Cooper relies on the portion of Figure 7 that shows that the CIU has a "CARD INFO. WRITE" function as part of its card management software. OB39, *citing* A0380. There is no dispute that the CIU *can* write to the non-volatile RAM 34 in some embodiments. Cooper wrongly argues, however, that only the CIU can write

evidence further supports the Board's rejection of Cooper's argument that only the CIU can read and write from the UET card's memory.[13]

Finally, Cooper raises arguments unique to claim 5 of the '005 Patent, but all are meritless.  Claim 5 is broader than the other claims because it requires only that the control circuit is "electrically connected to" and "interact[s] with" the memory.  Cooper tries to rewrite the claim by arguing that it requires the control circuit to store information in the memory.  OB41 (arguing that "the control circuit *inside the card apparatus* must act to do whatever storing from the host system is to be done[]") (emphasis in original).  No such requirement may be inferred from these two terms, as the Board correctly noted.  A0017-18 ("[C]laim 5 only requires that the control circuit means be connected electrically to and interact with the memory means.").  Cooper's belated concession that Pitroda's control circuit reads from the memory, *see supra* n.13, satisfies claim 5.  To the extent that Cooper is asking this

---

to non-volatile RAM 34.  As shown above, that is incorrect.  The Board properly found, the UET's microcontroller runs memory and database management software that writes to non-volatile RAM 34 and RAM 33.  A0016-17; A0040-41.

[13] For the first time on appeal, Cooper concedes that the microcontroller can *read* from non-volatile memory 34.  OB42.  He previously contended that the CIU is the star of the show, and only it "directly contacts, reads from, and writes to the UET card's non-volatile RAM 34[.]"  A0016; A0040.  It is not surprising that Cooper has abandoned his argument that Figure 3's connection between microcontroller 33 and non-volatile RAM 34 "can only be a representation of co-occupying the same physical housing space."  A0017; A0040 (quoting A1778:15-16).  His belated recognition that the microcontroller can read from memory does not move the needle, however.  Pitroda's other disclosures refute Cooper's suggestion that the microcontroller can only read—and not write—from memory.

Court to offer a construction of "electrically connected to" or "interact[s] with," he forfeited that request because he did not raise it in his Patent Owner Response.[14]

In sum, the Board's conclusion that Pitroda discloses the "control circuit" limitation in the reviewed claims of the '005 Patent and '207 Patent is supported by substantial evidence, and the Court should affirm.

### 3. Substantial evidence supports the Board's finding that Pitroda discloses an "operator interface" and "account location" ('005 Patent, claims 2-6; '207 Patent claims 9-12)

Cooper argues that Pitroda fails to disclose the "operator interface" and "account location" limitations,[15] but his argument largely ignores the disclosures on which the Board relied.  Rather than addressing the multiple locations in which Pitroda discloses that users select an account location for storing account information, *see* A0019-21, Cooper relies on deposition testimony regarding a

---

[14] *See* A1856; A3495; A5309 (warning Cooper that issues not raised in the Patent Owner Response are waived); 37 C.F.R. § 42.22-.23 (requiring all issues to be raised in Patent Owner Response); Office Patent Trial Practice Guide, 77 Fed. Reg. 48756, 48766 (Aug. 14, 2012) (codified at 37 C.F.R. Pt. 42); *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (requiring exhaustion pursuant to governing regulations); *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1255 (Fed. Cir. 2015) (same); *see also infra* pp. 65-69 (explaining these exhaustion requirements in the context of Cooper's constitutional arguments).

[15] Claim 9 of the '207 Patent and claim 2 of the '005 Patent recite "an operator interface . . . operable by a user to select an account location in said memory in which account data . . . is to be stored[.]"  A1928 at 11:33-37; A0170 at 10:29-33. Claim 5 of the '005 Patent similarly recites "operator interface means to accept inputs from a user to select an account for the receipt, transmission, storage and display of said selected account data . . . into and from said memory means[.]" A0171 at 11:3-7.

hypothetical presented to Square's expert. OB44-45. The Board correctly found that this testimony "does not diminish Pitroda's express disclosure." A0021. Cooper's reading of the testimony is also inconsistent with Dreifus's declaration. A0448; A2206. The Board's conclusion that Pitroda discloses these limitations is supported by substantial evidence, and the Court should reject Cooper's contrary arguments.

The Board began its analysis by noting that Pitroda expressly discloses an account-by-account process for initiating a transaction and storing account information related to that transaction: (a) using the UET card's display to review stored credit cards (also known as "service institution account[s]"); (b) selecting a particular credit card for a transaction; (c) receiving transaction information after the transaction is complete; and (d) storing that transaction information in a specific memory location "corresponding to each card[.]" A0019-21; A0042-43. The Board noted that Pitroda discloses and elaborates on this "account-by-account" process in several places.

For instance, Pitroda offers a summary of this process in "column 6, lines 16-43," and that summary concludes with the step of "'storing the transactional information for the credit transaction in the universal electronic transaction card with respect to the service institution account.'" A0019; A0042 (citing A0395 at

6:41-43).[16]  Pitroda likewise discloses that the user can retrieve a "record of transactions" for each credit card, which demonstrates to one of ordinary skill in the art "that *Pitroda* discloses storing records on an account-by-account basis." A0019-20; A0042-43 (citing A0394 at 4:12-15, 3:6-11, A0400 at 16:21-49, A0383 at Figs. 13-14, and A0399 at 14:2-6).  Finally, Pitroda discloses that the UET card's "transaction memory area 410" is partitioned into sections "*corresponding to each card*."  A0020; A0043 (citing A0398 at 12:1-4 and A0378 at Fig. 4). Based on these disclosures, the Board concluded that when the user selects a card, such as American Express, for a transaction, the user is also selecting "the transaction memory area corresponding to the American Express card" for storage of transaction information.  A0020; A0043.

Cooper tries to undercut the Board's conclusion by offering a baseless reading of "corresponding to each card."  In particular, he argues that Pitroda's reference to "a transaction memory area 410" "corresponding to each card" means only that each *UET card* has a transaction memory.  OB43.  The Board correctly rejected that argument as inconsistent with the surrounding disclosures.  A0020-21; A0043-44.  For example, the sentence prior to the one describing memory area 410 also uses the phrase "corresponding to each card," and it refers explicitly to elements specific to each *credit card* stored within the UET card, such as "date of

---

[16] Dreifus relied on this language in his declaration testimony.  A0448; A2206.

issue, date of expire, credit limit, etc." A0020-21; A0043-44 (citing A0398 at 11:65-67; 12:1-4). Because both sentences use the same phrase, and because the first sentence clearly refers to credit cards rather than UET cards, the Board concluded that "corresponding to each card" refers to credit cards rather than UET cards. A0021; A0044 (concluding that "Pitroda has a transaction memory area 410 corresponding to each of the credit cards 404, bank cards 405," and other cards the UET card stores). Substantial evidence supports the Board's conclusion.

Against this evidence, Cooper offers only a misreading of testimony provided by Square's expert. Square's expert simply agreed that it might be "possible" for a UET card to store "a stack of receipts undifferentiated by account." A0021; A0044 (citing A1227:14-A1228:6; A2880:14-A2881:6). The Board properly discounted the relevance of this hypothetical and instead credited "Pitroda in view of its complete disclosure." A0021; A0044. The Board correctly noted that Cooper's characterization of Dreifus's testimony should be rejected because it results in a "strained reading of Pitroda in view of its complete disclosure." A0021; A0044. And having concluded that this testimony "does not diminish Pitroda's express disclosure," the Board properly relied on it. A0021; A0044. The Board's conclusion that Pitroda discloses these claim limitations is supported by substantial evidence.

       **4.**       **Substantial evidence supports the Board's finding that Pitroda discloses an "account identifier" and "account identifier means" ('005 Patent, claims 3-4 & 6; '207 Patent claims 10-12)**

In support of his argument that Pitroda does not disclose an "account identifier,"[17] Cooper makes the same arguments disproven above. In particular, Cooper argues that this limitation is not satisfied because UET card users cannot "select[] an account for storage." OB46. The Board found, however, that Pitroda expressly discloses a transaction process in which users select an account to use in a transaction, to receive transaction information, and to store that transaction information. A0022-24; A0045-46. Cooper largely ignores the Board's findings and instead reiterates the arguments made in connection with the "operator interface" and "account location" limitations. OB47-49. As shown above, the Board's rejection of those arguments is supported by substantial evidence, and this Court should affirm.

Cooper does not dispute that Pitroda discloses graphical images that identify particular credit cards and cause account information to display when one of the

---

[17] Claim 3 of the '005 Patent and claim 10 of the '207 Patent recite an "account identifier . . . whereby the user of the credit card can select the account to be used to receive, store and display account information by specifying the account identifier for the account." A0170 at 10:41-49. Claim 6 of the '005 Patent recites "account identifier means . . . for allowing the user to direct the receipt, transmission and display of account data including account information . . . by reference to said account identifier means." A0171 at 12:14-20.

cards is selected.  A0045.  Indeed, Figure 13 plainly shows multiple credits cards, and Figure 14 shows selection (and display of account information) for one of those cards:



**FIG. 13**



**FIG. 14**

A0383.

Cooper argues, however, that Pitroda does not disclose using these account identifiers to designate an account for receipt or storage of account information. OB47. Cooper is wrong for the reasons identified above. Indeed, in ruling on this challenge, the Board referred to its prior analysis. A0045. As a summary, the Board reiterated that "Pitroda discloses a credit card transaction that begins with the user selecting . . . [an] account, and ends with 'storing the transactional information . . . .'" A0022-23; A0045. The Board therefore found that the selection of a credit card from the "display configuration" at the beginning of the transaction discloses the "account identifier" as claimed. The Board's conclusions are based on Pitroda's express disclosures and are supported by substantial evidence.

In an unsuccessful effort to undermine this evidence, Cooper repeats his assertions, refuted above, that the images of Figs. 13 and 14 are solely for display. OB47-48. He further relies upon Dreifus's deposition testimony regarding hypothetical storage of transaction receipts. OB48-49. As discussed above, this testimony does not undermine Pitroda's express disclosure that a user selects an account for storage of account information in the memory area corresponding to that account. A0020-21; A0043-44. Cooper's arguments do not undermine the substantial evidence upon which the Board relied.

## V.  THE BOARD PROPERLY CONCLUDED THAT KIKINIS ANTICIPATES THE CLAIMS AT ISSUE FROM THE '875 PATENT

Cooper's arguments regarding the '875 Patent also fail.  The Board carefully considered Kikinis's disclosures, and the expert testimony, and it correctly concluded that Kikinis discloses every element of the challenged claims.

Cooper raises three claim construction arguments, but he failed to present those arguments to the Board.  In particular, in his Patent Owner Response, Cooper did not seek construction of "emitter," "in a telephone," or "identification card account" as used in the claims under review.[18]  He therefore forfeited any right to ask this Court to construe those terms.  *See supra* n.14.

If the Court does decide to construe these claim terms in the first instance, it should reject Cooper's proposed constructions.  Cooper argues that "emitter" should be limited to devices that wirelessly transmit information "outside the device," OB25-27, but that construction is inconsistent with other claim language.  Cooper next argues that the term "in," within the term "in a telephone," requires a "combination" of elements rather than "juxtaposition."  OB27-29.  That argument rests on an unworkable distinction between "combinations" and "juxtapositions" that Congress and the courts explicitly abandoned more than 50 years ago.  Finally, Cooper argues that "identification card account" should be construed to exclude

---

[18] Cooper did argue, in connection with claims and prior art not at issue in this appeal, that an "emitter" must communicate to "outside devices."  A4532-33.

any overlap with "credit card," OB29-30, but that construction is contrary to the intrinsic evidence and this Court's cases.

In addition to his untimely claim construction arguments, Cooper argues that the Board lacked substantial evidence for its conclusions that Kikinis discloses the claimed "memory," "emitter," and "display." OB51-59. The Board's findings are well supported. Cooper's arguments on appeal consist primarily of rehashing factual arguments he presented to the Board, which the Board justifiably rejected. Cooper also argues that the Board lacked substantial evidence for its conclusions that: Kikinis discloses that its claimed components are "in a telephone"; and Kikinis stores information related to an "identification card account." OB59-60. Cooper forfeited both of those arguments by failing to raise them in his Patent Owner Response. *See supra* n.14. Even if he had raised them, they would fail. Kikinis discloses that the $\mu$PDA is in a telephone, and Kikinis discloses storing information related to an identification card account. Cooper cannot show that no reasonable mind would have reached the Board's conclusions and his challenges therefore fail.

### A.    Cooper forfeited the claim construction arguments he raises on appeal

Cooper's claim construction arguments are not properly before this Court. Regarding "emitter," Cooper sought construction of that term *only* as used in claims 14 and 16-24. A0057; A4531-33. Cooper now concedes that those claims

are unpatentable, and they are not part of this appeal.  OB9.  Because Cooper did not seek a construction of "emitter" as used in the claims at issue, and because the Board did not construe the term for those claims, Cooper may not raise the issue for the first time on appeal.  *See supra* n.14.

Cooper likewise forfeited the argument that "in a telephone" requires "composition" rather than "juxtaposition."  OB27-29.  In its Institution Decision, the Board rejected Cooper's proposed construction of "in a telephone[.]"  A4447 ("We are not persuaded by this proposal, which is vague because it fails to differentiate a covered 'combination' from a non-covered 'juxtaposition.'").  After institution, the Board's "Scheduling Order cautioned Patent Owner that any arguments for patentability not raised in the Response would be deemed waived."  A5309.  Cooper did not submit any argument or evidence for his preferred construction in his Response.  *See* A4514-4522 (failing to argue for his "composition" versus "juxtaposition" construction).  The Board accordingly ruled that Cooper did not dispute the construction or Kikinis's disclosure during trial.  A0061 at n.3 (noting the Board's rejection of Cooper's "in a telephone" construction in the Institution Decision and stating "Patent Owner did not dispute, during trial, that Kikinis discloses the 'in a telephone' limitation").  Because Cooper was on explicit notice that failure to raise an issue in the Response "waived" that issue at trial, he may not ask this Court for review.

Cooper evidently recognizes that he forfeited this argument, and he tries to circumvent the consequences of his actions by claiming that the Board "*implicitly*" engaged in further claim construction in the Final Written Decision by additionally construing the term "in." OB28 (emphasis added). That is wrong. No new claim construction occurred because the term was not in dispute. The Board did nothing more than apply its prior, undisputed construction.

Finally, Cooper failed to challenge at trial the Board's construction of "identification card account." In its Institution Decision, the Board construed the term as "an account which has an associated card, wherein the card identifies a person associated with the account." A0059. In its Final Written Decision, the Board correctly noted that "[n]either party has disputed this construction during trial." *Id.* Because Cooper did not challenge the Board's construction during trial, he forfeited the opportunity to raise this issue on appeal. See *supra* n.14.

**B.      The Court should reject Cooper's claim construction arguments**

### 1.      "Emitter" does not require "communication to an outside device" ('875 Patent claims 1-7, 9-13)

The Board—relying on the plain language of the claims and disclosures in the specification—correctly rejected Cooper's argument that the term "emitter" in claims 14 and 16-24 requires "communication to an outside device." A0058. If the Court decides to construe "emitter" in 1-7 and 9-13 of the '857 Patent, it should adopt the Board's construction.

46

Cooper's proposed construction fails at the first step, because it is contrary to the language of the claims. None of the challenged claims refer to communications with an "outside device." That omission is telling because other claims in the '875 Patent specifically recite communication with "an external device." For example, dependent claim 16 recites "a receiver configured to receive data *from an external device*." A3575 at 11:12-13 (emphasis added). As the Board found, "Claim 16 indicates [Cooper] knew how to limit communication to outside or external devices." A0057. Yet the independent claims at issue (claims 1, 12, 13, and 14) all lack the "external device" limitation of claim 16. A3574 at 9:59-10:9; A3574 at 10:43 to A3575 at 11:7. The Court should not import a limitation into those claims that was deliberately omitted.

Cooper argues that—even though the '875 Patent claims lack any reference to "outside" or "external devices"—the Court should import that limitation because "emitter" should be construed in the same way in the '875 Patent, the '005 Patent, and the '207 Patent. OB26-27. That argument overlooks the key differences between the claims of the '005/'207 Patents, on the one hand, and the '875 Patent on the other. First, the '005 and '207 Patents explicitly require the emitter to transmit signals to an outside device. *See, e.g.*, A1928 at 11:13-14 (requiring the emitter to "transmit[] account identifying information to [a] host system"); A0057 at 8 n.2. The claims of the '875 Patent have no such requirement. Second, the

claims of the '875 Patent state that "the display" can serve as the emitter. A3574-75. The claims of the '207 Patent and '005 Patent have no such disclosure.[19]

The '875 Patent's disclosure that "the display" can serve as the emitter is important because the specification clarifies that the display not only sends signals to external devices, *see* A3573 at 8:49-58, but also to users, *see* A3571 at 3:20-28 (disclosing that the display transmits data to the user in the form of information regarding "which account is associated with [the pressed] key"); A3572 at 6:6-17 (disclosing that the display is used to send the account identifier to the user). Accordingly, based on the claim language and the specification, the Board properly held that the "emitter" need not communicate with "outside devices." A0058. Indeed, Cooper himself testified that one way an electronic credit card "transmits" information—which is the sole purpose of the claimed emitter—is by displaying it to a salesperson. A5037:10-A5039:11 (testimony that the electronic card of Pitroda displays information to a salesperson); A1300 (testimony that salesperson's receipt of information from Pitroda's card is "information being transmitted out of the" card).

---

[19] Cooper suggests that claims 8 and 13 of the '207 Patent (like the claims of the '857 Patent) identify "the display" as a permitted emitter. OB25. That is plainly false. Neither the '207 nor '005 Patent claims identify the display as a permitted emitter. A0170 at 9:62 to A0171 at 12:20; A1927 at 9:54 to A1928 at 12:61.

Against this strong intrinsic and extrinsic evidence that the "emitter" need not communicate with "outside devices," Cooper offers only attorney argument. He contends—without any support in the intrinsic evidence—that the Board should not rely on the "external devices" limitation in claim 16 because it is a redundancy added "for emphasis,"  such as "degreed patent attorney" and "carbon based life form."  OB26; A5272:14-A5274:18.  Cooper's attorney argument is inconsistent with the intrinsic and extrinsic evidence discussed above.  And Cooper simply ignores the Board's reasoning (and his prior testimony) related to "the display" serving as the emitter.  A0058.  The Board correctly declined to import an "external device" limitation into the term "emitter."

> ### 2. The Board correctly determined that "in a telephone" needs no construction ('875 Patent claims 1-7, 9-13, 25-31, 33 & 34)

If the Court decides to construe "in a telephone," it should reject Cooper's construction of "a combination (not juxtaposition) of a telephone with the rest of the invention's circuit elements."  OB27.  Cooper's proposed distinction between "composition" and "juxtaposition" is unworkable and is based on case law that was overruled in 1953.  The Board correctly rejected that distinction in its Institution Decision.  A4447.

Cooper's primary argument is that his construction is necessary to ensure the claims involve a "patentable combination" under precedent he contends is binding.

OB28.  The cases Cooper cites, however, are not binding.  They address the pre-1953 standard for 'invention' that was superseded by 35 U.S.C. § 103.  Cooper relies on *Mesta Machine Co. v. Federal Machine & Welder Co.*, but it is a pre-1953 opinion applying the old standard.  110 F.2d 479 (3d. Cir. 1940).  Subsequent opinions, such as *In re Gustafson*, discuss at length the unworkability of the distinction between "aggregation" and "combination," and noted that this unworkability prompted Congress to replace the previous standard with the modern obviousness standard.  331 F.2d 905, 909 (C.C.P.A. 1964) ("On January 1, 1953, *all of this mental anguish ceased to be necessary* . . . [w]hether a device or process was or was not an 'aggregation,' or a 'combination,' or an 'unpatentable combination' for want of 'invention,' was replaced by the statutory test of 35 U.S.C. § 103." (emphasis added)).  In other words, the distinction between "aggregation" and "combination" was so broken that Congress abandoned it entirely.  *See* Robert L. Harmon et al., PATENTS AND THE FEDERAL CIRCUIT 206-07 (12th ed. 2015) (characterizing the reign of the pre-1953 "invention" standard as "a century of confusion and conflicting precedent . . . unsurpassed by that generated in respect of any other issue in American law.").

Cooper's proposed distinction between "juxtaposition" and "composition" is based on the "combination"/"aggregation" dichotomy properly abandoned long ago.  *Id.*; *Gustafson*, 331 F.2d at 909.  As the Board noted in its Institution

Decision, the distinction Cooper proposes is "vague because it fails to differentiate a covered 'combination' from a non-covered 'juxtaposition.'" A4447. Indeed, Cooper does not articulate any basis for applying this distinction, and instead asserts that the distinction should be maintained because the specification uses the word "combined[.]" OB27. The specification, however, mentions only that the "invention may be combined with . . . telephone . . . functions." A3771 at 3:46-50. There is no contrast between "combination" and "juxtaposition" in the intrinsic evidence and no hint of the distinction that Cooper now proposes. The Board, Congress, and this Court's predecessor all have concluded that Cooper's proposed construction is vague and unworkable. This Court should reject it.

### 3.    The Board correctly construed "identification card account" ('875 Patent claim 12)

If the Court does construe "identification card account," it should reject Cooper's construction.[20] The Board's construction in its Institution Decision is firmly grounded in the intrinsic record. The Board reviewed the entire specification and considered how that term "identification card account" is used in the claims and how the term "identification cards" is used in the specification. A4449. The Board concluded that an identification card account is "an account

---

[20] Cooper proposes the following: "information that serves as the account number (including binary representations), or information that serves as an account identifier (including binary representations), of an identification card account that is not a credit card account." OB29.

which has an associated card, wherein the card identifies a person associated with the account." *Id.*

Cooper's sole argument on appeal is that "identification card account" may not overlap in any way with "credit card account" because the terms are "separate[ly] mention[ed]." OB29-30. This assertion is not supported by the specification: There is nothing in the specification stating that credit card accounts and identification card accounts must be mutually exclusive. Cooper also fails to address the Board's citation to Federal Circuit authority holding that "simply noting the difference in the use of claim language does not end the matter. Different terms or phrases in separate claims may be construed to cover the same subject matter[.]" A4449 (citing *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009)). Using *Edwards*, the Board properly construed "identification card account." The fact that its construction does not prohibit certain credit card accounts from also satisfying the "identification card account" limitation does not undercut the construction. *Id.*

## C.    Substantial evidence supports the Board's factual findings

In addition to his untimely (and forfeited) claim construction arguments, Cooper argues that the Board lacked substantial evidence for its factual conclusions. OB51-60. Regarding Cooper's challenges to "memory," "emitter," and "display," Cooper's arguments fall well short of demonstrating that no

"reasonable mind" could have reached the Board's conclusions. *In re Gartside*, 203 F.3d at 1312. Cooper also tries to raise two additional challenges—that Kikinis does not disclose the claim elements "in a telephone" and does not disclose storing information regarding an "identification card account." Cooper forfeited those arguments. But even if the Court considers them, it should affirm, because substantial evidence supports the Board's finding that Kikinis discloses those elements.

### 1. Substantial evidence supports the Board's finding that Kikinis discloses "memory" ('875 Patent claims 1-7, 9-11, 13, 25-31, 33 & 34)

The Board justifiably concluded that Kikinis discloses a memory "configured to store information related to at least one credit card account." A3574 at 9:64-65; A0061; A4452. The Board based its conclusion on the plain language of Kikinis, which states "associated *credit card numbers* are readily available" and "the $\mu$PDA dials the call, including necessary *credit card information* stored in the *memory* of the $\mu$PDA[.]" A0063 (citing A4064 at 14:33-50 (emphasis added)).

The Board properly rejected Cooper's argument, repeated on appeal, that "credit card" means "phone card." OB55-57. This argument, which relies solely on Cooper's declaration, is "contrary to the plain language of the Kikinis disclosure" of "credit card numbers" and "credit card information." A0062.

Moreover—and contrary to Cooper's testimony—the record demonstrates that at the time of the '875 Patent, a user "could pay for phone calls using a credit card." A4647:17-A4649:21; *see also* A4116 at 1:6-65, A4117 at 3:53-62 (disclosing that "conventional credit cards" were used to pay for calls); A4846-47 (disclosing that AT&T and Sprint offered a combined credit card and calling card). Accordingly, the Board justifiably concluded that Kikinis's explicit disclosure of "credit cards" satisfied this limitation, whether or not those credit cards could also be used to pay for phone calls. A0062 ("There is no limitation . . . requiring the credit card account to be issued by a financial institution rather than a phone company."). The Board's conclusion is based on substantial evidence.

### 2. Substantial evidence supports the Board's finding that Kikinis discloses an "emitter" ('875 Patent claims 1-7, 9-13) and "using ... to send" ('875 Patent claims 25-31, 33 & 34)

The Board's conclusion that Kikinis discloses an "emitter" that transmits credit card information is supported by substantial evidence.[21] The Board recounted that Kikinis discloses an "antenna" for "[c]ellular telephone 45" that is usable by the $\mu$PDA. A0064 (citing Dreifus's declaration, A4204, and Kikinis, A4064 at 14:26-50). The Board also cited Kikinis's disclosure that the "$\mu$PDA

---

[21] Claims 1, 12, and 13 recite "an emitter ... to [transmit, or provide, or emit] a signal relating to the information . . . comprising at least one of an antenna, coil, transducer, the display, and an infrared LED." A3574. Claim 25 similarly recites "using at least one of an antenna, coil, a transducer, a display, and an infrared LED to send a signal relating to the information." A3575.

dials the call, *including necessary credit card information stored in the memory of the µPDA for this purpose*." A0064 (citing A4064 at 14:36-50 (emphasis added)). The Board concluded from this express disclosure that "the necessary credit card information is included in the dialing of the call, and therefore transmitted by the antenna." A0064.

Before the Board, and on appeal, Cooper wrongly argues that Square's expert conceded that credit card information is not transmitted during a call. To the contrary, and as the Board found, Dreifus testified that "the credit card information is included as part of the process of initiating and setting up the call" and "in the process of dialing that call, it[']s also saying including necessary credit card information." A0064-65.[22] Cooper's argument rests on mischaracterizations of Dreifus's testimony and Kikinis's clear disclosure.

Finally, Cooper does not address an alternative basis for the Board's ruling—evidence showing that Kikinis discloses an infrared interface that transfers data, including credit card data, from the µPDA to a host computer.[23] In sum,

---

[22] Cooper argues that the word "yes" at the outset of Dreifus's answer is testimony that Kikinis's telephone does not transmit credit card information via the cellular antenna. OB58. To the contrary, the answer that follows shows precisely what Dreifus meant by "yes": "[T]he credit card information *is* included as part of the process of initiating and setting up the call." A1157:17-23 (emphasis added).

[23] *See* A0065 (citing A4204-4205 (Dreifus's declaration testimony regarding the infrared interface transfers); *id.* (citing A4050 at Fig. 13 (infrared emitter on µPDA)); *id.* (citing A4060 at 5:49-58 (communication with host computer)); *id.*

there is substantial evidence (much of it undisputed) supporting the Board's finding that "Kikinis discloses two structures, each separately satisfying the 'emitter' limitation of claim 1: antenna of telephone 45 and IR interface 94." A0065-66.

### 3. Substantial evidence supports the Board's finding that Kikinis discloses a "display" ('875 Patent claims 1-7, 9-13, 25-31, 33 & 34)

Substantial evidence supports the Board's determination that Kikinis discloses the "display" limitations. Claims 1, 12, and 13 of the '875 Patent require "a display . . . configured to display at least part of the [account] information upon selection of the designator[.]" A3574. Claim 25 likewise requires "displaying at least part of the information upon selection of a designator." A3575. The Board properly found that Kikinis discloses those limitations to a person of ordinary skill in the art based on its review of the specification and Dreifus's deposition and declaration testimony. A0062-65.

The disclosures in Kikinis support the Board's conclusion. Kikinis's $\mu$PDA, when docked with the cellular telephone, provides "*display configuration*s" and "*all of the user's collection of* phone numbers, *associated credit card numbers, access codes, etc. are readily available and may be quickly and conveniently*

(citing A4065 at 16:6-11 (interfacing with host computer via infrared)); *id.* (citing A4064 at 13:21-27 (infrared communication with vending machine)); *id.* (citing A4065 at 15:60-16:11 (infrared communication with home and office equipment)).

*accessed and used*."   A0062 (emphasis in original).   The Board found that this disclosure of "display configurations" allowing easy access to, and use of, the credit card information "reflects the action of displaying credit card account information in the $\mu$PDA 10 display."   A0063.

The testimony of Square's expert likewise supports the Board's conclusion. He testified that Kikinis discloses—to one of ordinary skill in the art—that Kikinis's microcontroller causes "information stored in memory 13 to appear on display 25," and the user may use the "I/O interface 16 and/or thumbwheel 18 to access and display information stored in memory 13."   A4203 (cited at A0062).[24] The Board relied on that testimony, and on Dreifus's deposition testimony, in which he reiterated that the $\mu$PDA displays "whatever is programmed into the card."   A4641:23-24.[25]

The Board properly rejected Cooper's mischaracterization of Dreifus's deposition testimony.   Cooper tries to nullify the substantial evidence noted above by suggesting that Dreifus admitted, at his deposition, that Kikinis does not

---

[24] *See also* A4064 (14:33-35, 49-50) (Kikinis's disclosure that "all of the . . . memory of the $\mu$PDA is available to the telephone" and "credit card information [is] stored in the memory of the $\mu$PDA").

[25] The Board did not specifically cite this portion of Dreifus's deposition testimony, but it referred generally to "Mr. Dreifus's testimony concerning [Kikinis's] disclosure at [14:36-41]."   *See* A0063 (citing A4064 at 14:36-41).   That testimony is found, in part, at lines 23-24 of Dreifus's deposition.   *See* A4641:23-24.

disclose display of credit card information. OB53-54. He is mistaken. As the Board correctly found, Dreifus was testifying about a different disclosure in the specification, which details "one aspect" of the Kikinis invention involving the user's selection of a party to be called. A0063. Not only is the Board's finding reasonable, it is the only reasonable conclusion regarding Dreifus's testimony. Cooper's counsel began this line of questions by reading the portion of Kikinis that addresses the "one aspect" embodiment. A4642:2-10. The questions and answers that followed explicitly addressed that quoted text. Cooper's attempt to re-characterize Dreifus's testimony is baseless. Dreifus did not disavow his detailed declaration and deposition testimony establishing that Kikinis discloses the display of credit card information. *See supra* pp. 57-58.

Cooper also argues that the "one aspect" disclosure negates the other disclosures because it is "more detailed" and "flesh[es] out" Kikinis's other disclosures. That, too, is wrong. The "one aspect" disclosure is a single example that does not, and could not, limit the broader disclosures that precede and follow it. A4064 at 14:33-41, 14:48-50. In sum, Cooper has fallen well short of showing that no fact-finder could reasonably conclude that Kikinis discloses the "display" limitation.

### 4.    Cooper forfeited his challenges regarding "in a telephone" and "identification card account"

On appeal, Cooper argues for the first time that Kikinis does not disclose the "in a telephone" and "identification card account" limitations. Cooper did not raise those arguments in his Patent Owner Response. A4514-22. Accordingly, Cooper forfeited those arguments and may not raise them now. *See supra* n.14. If the Court does consider them, it should affirm, because the Board's findings are supported by substantial evidence.

### (1)    Substantial and undisputed evidence supports the Board's finding that Kikinis discloses "in a telephone" ('875 Patent claims 1-7, 9-13, 25-31, 33 & 34)

Because Cooper did not challenge Kikinis's disclosure of "in a telephone," the Board did not dwell on the issue. However, the Board did state the evidentiary basis for its conclusion that Kikinis disclosed this limitation: it credited the testimony of Dreifus and the intrinsic evidence disclosing "that, when $\mu$PDA 10 is docked in telephone 45, $\mu$PDA 10 is 'in' the telephone 45 as required by claim 1." A0061 (citing A4199-200 (Dreifus's testimony), A4059 at 3:20-35 (Kikinis's disclosing of docking), and A4064 at 14:26-35 (Kikinis's disclosure of docking with a cellular phone)).

Cooper does not dispute any of this evidence. He merely repeats his erroneous claim construction arguments and proclaims that "[t]he docking of

Kikinis's PCMCIA card to its specialized telephone does nothing more than juxtapose the two items[.]" OB59. This unsupported assertion—in which Cooper offers no explanation of how the purported "juxtaposition" of Kikinis is different than a combination—underscores that Cooper's proposed construction is unworkable. The Board's ruling is supported by substantial evidence.

> **(2)    Substantial evidence supports the Board's finding that Kikinis discloses storing "identification card account" information ('875 Patent claim 12)**

Square's expert testified that Kikinis discloses, to one of ordinary skill in the art, that "memory 13 stores information related to at least one identification card account." A4214. He relied, in part, on Kikinis's teaching that memory 13 stores the "user's collection of . . . associated credit card numbers, access codes, etc." A4064 at 14:38-40. Relying on that same language, the Board likewise concluded that Kikinis's memory stores information related to an identification card account. A0066 (cross referencing the Board's prior analysis).

The Board focused on Kikinis's disclosure of credit card accounts, because such accounts have associated cards, which "identif[y] a person associated with the account." *Id.* Cooper does not disagree. *See* OB 60 (quoting Dreifus's declaration and Kikinis's specification, both of which disclose cards that identify the account holder). Kikinis's disclosures, however, go beyond credit card accounts. By mentioning credit cards, access codes, and additional information, Kikinis

discloses storing "identification card account" information under any reasonable construction of that term.   The Board's conclusion is based on substantial evidence.

## VI.   GUTMAN ALSO ANTICIPATES THE CLAIMS AT ISSUE FROM THE '875 PATENT, UNDER THE CORRECT CONSTRUCTION OF "A TELEPHONE"

In the event the Court decides that Kikinis does not anticipate the '875 Patent claims at issue, it can affirm on the basis that Gutman anticipates those claims.   The Board correctly concluded that Gutman anticipates every claim from the '875 Patent that does not recite "a telephone."   A0068-72.   Indeed, Cooper does not challenge that ruling on appeal.   OB9.   The Board erred, however, when it held that Gutman does not disclose "a telephone."   A0068-72.   This issue is straightforward and easily resolved by this Court without remand because the Board has already opined that Gutman anticipates substantially similar claims that do not recite "a telephone," A0072-75, and the parties presented their arguments regarding Gutman's disclosure of "a telephone" to the Board directly and succinctly.   A4527-29 (Cooper's "No Telephone" argument); A4825-26 (Square's contrary argument).

There are two, independent reasons that Gutman discloses the claimed "telephone."   First, the Board mistakenly construed "a telephone" as requiring "a microphone and a speaker."   A0057.   The intrinsic evidence and extrinsic evidence

does not support that construction. As the Board properly noted, the intrinsic record "is 'sparse.'" A0056. It does not refer to "a telephone" by itself, only "telephone . . . functions." A3571 at 3:46-50. And beyond that brief mention, the specification does not articulate what those telephone functions are. Accordingly, the intrinsic record does not support a construction of "a telephone" that requires "a microphone and a speaker."

The extrinsic evidence confirms that conclusion. Square submitted into evidence a definition from the *Wiley Electrical and Electronics Engineering Dictionary* to illuminate the plain and ordinary meaning of "telephone." That dictionary predates the filing of the application of the '875 Patent by six years and provides that a telephone is any device used to send and receive signals via telephony, and it lists a computer and a fax as examples. A4842. These signals can involve "speech or data." A4843 (defining telephony and providing that "[t]elephony may be utilized to transmit speech or data" and can include computer-to-computer communications). Square's expert likewise opined that "telephonic capabilities" satisfy the "telephone" limitation. A4253.

The construction from the Board's Final Written Decision is too narrow because it only considers speech. In contrast, the Board's interpretation of "a telephone" in the Institution Decision appropriately recognized that one of ordinary skill in the art would understand that the ordinary meaning of telephone includes

devices having components allowing for data communication over a telephone line. A4458 (holding that Gutman discloses a telephone when its electronic wallet "communicate[s] . . . via a wired telephone line using telephone interface circuitry 230").

Accordingly, one of ordinary skill in the art would understand that Gutman discloses a "telephone." Gutman's electronic wallet includes telephone components—namely telephone line interface 230 along with modem 232 and dual tone multi-frequency transceiver 234. A4070; A4088 at 9:10-26. Those components allow Gutman's electronic wallet to "dial a telephone number for a central financial computer system" to communicate credit card data with institutions via Public Switch Telephone Network (PSTN), via PBX, or via wired or wireless means. A4827; *see also* A4088 at 9:10-22, 9:45-52; A4071. The only thing Gutman lacks is a telephone microphone and telephone speaker, which the '875 Patent does not require.[26] Under the correct claim construction, Gutman anticipates the '875 Patent's "telephone" claims.

The second reason that Gutman anticipates is that it *does* disclose a microphone and speaker. In particular, when discussing the electronic wallet's card reader, Gutman discloses a "*communication system* incorporating a financial

---

[26] Cooper relied on a definition for "telephone set," which is inapposite because the claims do not require a "telephone set." A4825-26.

card reader at a mobile radio-*telephone unit*." A4086 at 5:59-61 (emphasis added). The Board improperly ignored this text when it concluded that this sentence discloses only that Gutman's electronic wallet can have a card reader. To the contrary, Gutman links the "card reader 122" to "a mobile radio *telephone* unit." *Id.* (emphasis added). Of course, a "telephone unit" necessarily includes a telephone speaker and telephone microphone under the Board's construction of "telephone."

This disclosure is augmented by U.S. Patent No. 4,831,647 ("D'Avello"), which Gutman incorporates by reference. A4086 at 5:59-65. By incorporating D'Avello, Gutman fully articulates all of its contents. *Harari v. Lee*, 656 F.3d 1331, 1335-36 (Fed. Cir. 2011). D'Avello confirms that the card reader and telephone handset are a single unit. A4118 at 5:23-28; *see also* A4096 at Abstract; A4101 at Fig.5. Accordingly, incorporating D'Avello's card reader into Gutman's electronic wallet necessarily incorporates the corresponding telephone handset.

In sum, "telephone" was the only limitation the Board found missing (A0068-72) from Gutman, but Gutman discloses a "telephone" even under the Board's mistaken construction. Gutman therefore anticipates claims 1-7, 9-13, 25-31, 33, and 34 of the'875 Patent.

## VII. THE COURT SHOULD NOT CONSIDER COOPER'S ARGUMENTS CHALLENGING THE CONSTITUTIONALITY OF *INTER PARTES* REVIEW

### A.     Cooper forfeited his constitutional arguments by failing to present them to the Board

Litigants may challenge an agency's action, or enabling statute, as unconstitutional, but they can only obtain judicial review of those arguments if they first present them to the agency. And the agency may specify how such arguments must be presented. Here, the Board's rules required Cooper to raise, in his Patent Owner Response, every issue he wanted the Board to consider. Cooper did not raise his constitutional challenges in his Response. He therefore waived those challenges under both Supreme Court and Federal Circuit authority.

In *Woodford v. Ngo*, the Supreme Court held that parties must exhaust administrative remedies by "using *all the steps the agency holds out*, and doing so *properly*." 548 U.S. 81, 90 (2006) (second emphasis original; citations omitted). The Court reasoned that exhaustion according to agency procedures protects agency authority by requiring parties "to give the agency a fair and full opportunity to adjudicate their claims." *Id.* at 89, 90. The Court therefore concluded that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* This Court has likewise held that a party's failure to exhaust administrative

remedies "precludes judicial review of its claim." *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1255 (Fed. Cir. 2015). *Palladian* further held that exhaustion requires litigants not only to present their arguments in accord with governing statutes, but also to comply with regulatory obligations that require arguments to be presented in a particular way. *Id.* ("[T]he fact that the administrative remedy was provided by a regulation rather than by a statute does not make the exhaustion doctrine inapplicable or inappropriate") (quotation marks omitted).

The AIA delegates authority to the USPTO to promulgate rules governing *Inter Partes* Review proceedings before the PTAB. *See* 35 U.S.C. § 316(a). The PTO's rules require that *Inter Partes* Petitions and the Patent Owner Response each state: (1) the "precise relief requested;" and (2) a "full statement of the reasons for the relief requested including a detailed explanation of the significance of . . . the governing law, rules, and precedent." 37 C.F.R. § 42.22-23. The USPTO also has promulgated a practice guide that clarifies that arguments must be made in the Patent Owner Response or else forfeited. *See* 77 Fed. Reg. 48756, 48766 (Aug. 14, 2012) (PTO trial practice guide). Cooper's Patent Owner Responses did not include Cooper's constitutional arguments. A1033-51; A2684-2703; A4509-38. The only place that Cooper raised any issue regarding alleged constitutional infirmities was in his preliminary response. A0951-52; A2605-07;

A4436-38.  That is not sufficient.  To comply with the PTO's rules, Cooper was required, in his Patent Owner Response, to state a constitutional ground for relief and provide a "detailed explanation" of the constitutional authority that would justify such relief.  37 C.F.R. § 42.22-23.  Cooper failed to comply with *Woodford*'s exhaustion requirement, and his failure to exhaust available remedies precludes judicial review.  *See Palladian*, 783 F.3d at 1255.  This Court should not entertain Cooper's constitutional arguments.

Cooper's failure to exhaust is notable because the Board explicitly reminded him that arguments "not raised in the [Patent Owner] Response would be deemed waived."  A1856; A3495; A5309.  And several courts—relying on well-established precedent—have held that judicial relief is inappropriate when plaintiffs have not yet exhausted all available administrative remedies, even for constitutional claims.  *See Cooper v. Lee*, 86 F. Supp. 3d 480, 486 (E.D. Va. 2015) (holding, based on long-standing authority, that the exhaustion requirement applies even when "an administrative litigant challenges the constitutionality of a statute that an agency is charged with implementing"); *Milwaukee Elec. Tool Corp. v. Hilti, Inc.*, 2015 WL 5795519, at *9 (E.D. Wis. Oct. 2, 2015) (citing *McKart v. United States*, 395 U.S. 185, 194 (1969) and holding patent holder's Seventh Amendment objections to *Inter Partes* Review were inappropriately raised because the plaintiff failed to first exhaust its administrative remedies before the PTAB).

The *Inter Partes* Review process involves both discretionary powers granted by Congress to the USPTO and the application of the USPTO's special expertise in patent. Thus, the prudential factors that underpin the exhaustion doctrine apply with great force here. *See Cooper*, 86 F. Supp. 3d at 487. Litigants wishing to challenge an agency's organic statute must seek a final decision on the merits of their constitutional contentions before seeking judicial review. *Id.* at 489. ("[I]f the PTAB rules against Plaintiffs', they can appeal that decision directly to the Federal Circuit. . . . The constitutional challenge to the *inter partes* review proceedings would be properly raised therein . . . as the administrative processes under the AIA would be exhausted."). Cooper failed to raise his arguments in compliance with governing rules. The Board justifiably declined to address Cooper's untimely challenges,[27] and they are not properly before this Court.

### B. Even If the Court Were To Consider Cooper's Forfeited Argument, It Should Affirm the Board's Decision Following *MCM Portfolio*

If the Court does choose to consider Cooper's constitutional arguments, it can quickly dispose of them. After Cooper filed his opening brief, this Court held

---

[27] *See supra* pp. 13-14. Notably, the Board has considered constitutional challenges to the USPTO proceedings under the AIA when properly presented. On at least two occasions, the Board considered and rejected constitutional challenges to the *Inter Partes* Review process during those proceedings. *See, e.g.*, IPR2014-01165 at 25-26; IPR2013-00217 at 4-5. Had Cooper properly raised his challenges, he would have received a ruling from the Board and could have sought review of that ruling before this Court.

that nothing in Article III or the Seventh Amendment barred Congress from establishing *Inter Partes* Review. *MCM Portfolio*, __ F.3d __, 2015 WL 7755665, at *1. Cooper participated in *MCM Portfolio* as *amicus curiae*. *Id.* *MCM Portfolio* controls here, and the Court should reject Cooper's constitutional challenges.

### 1. *Inter* Partes Review Is Consistent With Article III

Article III provides that the "judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. Article III ensures an independent judiciary by mandating that judges in these courts "shall hold their Offices during good Behaviour" and "receive for their Services, a Compensation, which shall not be diminished" during their tenure. *Id.* The Constitution thus prohibits Congress from vesting the "judicial Power of the United States" outside of courts whose judges enjoy the protections of Article III. "[I]n general," this prohibition prevents Congress from withdrawing from Article III courts any matter which, by its nature, involves the exercise of judicial power. *Stern v. Marshall*, 131 S. Ct. 2594, 2609 (2011).

There are important exceptions to this general rule, however. For example, "Congress has the power to delegate disputes over public rights to non-Article III courts." *MCM Portfolio*, 2015 WL 7755665, at *5 (citing *Murray's Lessee v.*

*Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855)) ("[T]here are matters involving public rights which may be presented in such form that the judicial power is capable of acting on them . . . but which Congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.").

Whereas private rights involve "the liability of one individual to another under the law as defined," *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51 n.8 (1989) (citation omitted), public rights are those rights arising "'between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments[.]'" *Stern*, 131 S. Ct. at 2612 (quoting *Crowell v. Benson*, 285 U.S. 22, 50 (1932)).  Because the Constitution authorizes Congress to create public rights, it equally authorizes Congress to commit these rights to adjudication in non-Article III courts.  *See id*. at 2612-13 (stating that Congress may set the terms by which public rights are adjudicated).

The Supreme Court's expression of the public-rights exception has been subject to "various formulations," *Stern*, 131 S. Ct. at 2611, but the relevant features of public rights are well settled.  A right is "public" rather than "private" when it "is integrally related to particular federal government action."  *Id*. at 2613.  Indeed, where Congress has acted "for a valid legislative purpose pursuant to its constitutional powers under Article I," it may delegate even a "seemingly private

right" to non-Article III courts if the right "is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution." *Granfinanciera*, 492 U.S. at 54 (quotation marks omitted). That is true even if the federal government is not a party to the litigation. A dispute between private parties implicates public rights if "the claim at issue derives from a federal regulatory scheme," or if "resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority." *Stern*, 131 S. Ct. at 2613.

Patents are quintessential public rights.[28] Accordingly, Congress may entrust the adjudication of those rights to a non-Article III tribunal. *MCM Portfolio*, 2015 WL 7755665, at *6. Indeed, in *MCM Portfolio*, this Court reviewed the "teachings of the Supreme Court" and found them to "compel the conclusion that assigning review of patent validity to the PTO is consistent with

---

[28] As the Supreme Court has held, patents "exist only by virtue of statute." *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229 n.5 (1964). Because patents are statutory grants conferring exclusive rights against the public at large, "[a] patent by its very nature is affected with a public interest." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 816 (1945). Patent law has always "been about the difficult business 'of drawing a line between the things which are worth to the public the embarrassment of an exclusive patent, and those which are not.'" *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 148 (1989) (quoting 13 *Writings of Thomas Jefferson* 335 (Memorial ed. 1904)). In short, patents "dispose of public rights held by the government on behalf of the people." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 848 n.2 (2015) (Thomas, J., dissenting).

Article III." 2015 WL 7755665, at *6. This Court went on to emphasize that review of a claimed invention's patentability is precisely the type of matter that Congress may delegate to an expert agency for decision. Congress has established the *Inter Partes* Review scheme "for a valid legislative purpose pursuant to its constitutional powers under Article I." *Granfinanciera*, 492 U.S. at 54 (quotation marks omitted). The right to obtain a United States patent "is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution." *Id.* (quotation marks omitted). And resolution of *Inter Partes* Review by an expert administrative tribunal is "essential to a limited regulatory objective within the agency's authority"—specifically, correcting the agency's own mistakes. *Stern*, 131 S. Ct. at 2613. Because Congress may empower PTO to issue patents in the first instance, it may equally empower PTO to revisit its decisions to ensure that the patents were properly issued. "It would be odd indeed if Congress could not authorize the PTO to reconsider its own decisions." *MCM Portfolio*, 2015 WL 7755665, at *6. In sum, *MCM Portfolio* explored at length why *Inter Partes* Review is consistent with Article III, and that decision controls here.

The authority Cooper cites is not to the contrary. Cooper points to *McCormick Harvesting Mach. Co. v. Aultman*, 169 U.S. 606 (1898) and *United States v. Am. Bell Tel. Co.*, 128 U.S. 315 (1888), two 19th century Supreme Court

72

patent decisions that assertedly call into question the PTO's authority to reconsider the validity of issued patents. *See* OB61-64. But neither of these cases undermines the constitutionality of *Inter Partes* Review. *McCormick Harvesting* "did not address Article III and certainly did not forbid Congress from granting the PTO the authority to correct or cancel an issued patent." *MCM Portfolio*, 2015 WL 7755665, at *5. Rather, the issue in *McCormick Harvesting* was the PTO's lack of *statutory* authorization at that time to cancel certain patent claims. *Id.* at *4. *American Bell* likewise involved the "lack of *statutory* authority for the Patent Office to cancel patents." *Id.* (emphasis added) (citing *Am. Bell*, 128 U.S. at 364-65). Since that time, Congress granted the Patent Office statutory authority to cancel invalid patent claims "by creating the ex parte re-examination proceeding in 1980; the inter partes re-examination procedure in 1999; and inter partes review . . . in 2011." *Id.* at *5. Congress accordingly has provided the very statutory authority found to be lacking in *McCormick Harvesting* and *American Bell*.

The other decisions Cooper cites are likewise inapposite. *Iron Silver Mining Co. v. Campbell*, 135 U.S. 286, 293 (1890), *Moore v. Robbins*, 96 U.S. 530, 532-33 (1877), and *United States v. Stone*, 69 U.S. 525 (1864) involve land patents. Patents for land are distinct from patents for inventions under Article III. Patents for land implicate property that is owned by, but not created by, the federal government, whereas patents for inventions "exist only by virtue of statute," *Stiffel*,

376 U.S. at 229 n.5. Invention patents, in contrast, are created entirely by the federal government. As shown above, "what makes a right 'public' rather than private is that the right is integrally related to particular federal government action." *Stern*, 131 S. Ct. at 2613. Thus, patents for inventions implicate public rights even if land patents may not. *Compare B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1317 (2015) (Thomas, J., dissenting) (referring to land patents as "quasi-private rights"), *with Teva Pharm.*, 135 S. Ct. at 848 n.2 (Thomas, J., dissenting) (referring to invention patents as "public rights").

### 2. *Inter Partes* Review Is Consistent With the Seventh Amendment

In *MCM Portfolio*, this Court properly rejected Cooper's Seventh Amendment Arguments: "Because patent rights are public rights, and the validity susceptible to review by an administrative agency, the Seventh Amendment poses no barrier to agency adjudication without a jury." 2015 WL 7755665, at *9.

Cooper wrongly contends that the Seventh Amendment requires a jury to determine the patentability of his claims. But the Seventh Amendment jury-trial right applies only to legal claims involving rights that must be adjudicated in Article III courts: "[T]he Seventh Amendment is generally inapplicable in administrative proceedings, where jury trials would be incompatible with the whole concept of administrative adjudication and would substantially interfere with [the agency's] role in the statutory scheme." *Id.* at *8 (quoting *Curtis v.*

*Loether*, 415 U.S. 189, 194 (1974)); *see also Tull v. United States*, 481 U.S. 412, 418 n.4 (1987) (noting that "the Seventh Amendment is not applicable to administrative proceedings"); *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 455 (1977) ("[W]hen Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.'").

"Under Supreme Court decisions such as *Curtis* and *Atlas Roofing*, there is no basis for [Cooper]'s contention that [he] has a right to a jury trial." *MCM Portfolio*, 2015 WL 7755665, at *8. This Court has repeatedly concluded that the Seventh Amendment does not apply to disputes over statutory public rights. *Id.*; *Joy Techs.*, 959 F.2d at 228 ("[C]ases involving 'public rights' may constitutionally be adjudicated by legislative courts and administrative agencies without implicating the Seventh Amendment right to jury trial."). Those holdings apply here.

The authority on which Cooper relies, *see* OB67-68, is not to the contrary. In particular, *MCM Portfolio* reasoned that *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 377 (1996), "does not suggest that there is a jury trial right in an administrative adjudication of patent validity." *MCM Portfolio*, 2015 WL

7755665, at *8 n.2. *MCM Portfolio* likewise held that *In re Lockwood*, 50 F.3d 966 (Fed. Cir. 1995), fails to "imply that there is a right to a jury trial in an agency proceeding." 2015 WL 7755665, at *8 n.2.

*MCM Portfolio* further rejects Cooper's claim that *Inter Partes* Review is unconstitutional even if *ex parte* reexamination is not. OB69-73. The Court relied on *Joy Techs.*, *Patlex*, and the Supreme Court's decision in *Granfinanciera v. Nordberg*, 492 U.S. 33 (1989), in holding that public rights may constitutionally be adjudicated in *Inter Partes* Review proceedings without implicating the Seventh Amendment right to a jury trial. 2015 WL 7755665, at *8.

Cooper argues that *Inter Partes* Review is an "adjudication" that is distinct from ex parte reexamination. He contends that *ex parte* reexamination is permissible because it "operate[s] as a legal fiction that the USPTO is reexamining the patent to correct a governmental mistake" rather than as "a court-like trial[.]" OB68-73. But as this Court and the Supreme Court have both recognized, administrative agencies may conduct quasi-adjudicative proceedings—even involving claims between individuals—as long as the proceedings implicate public rights. *MCM Portfolio*, 2015 WL 7755665, at *5 (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 587 (1985)); *see also B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1316 (2015), (Thomas, J. dissenting) (recognizing that administrative agencies may permissibly "function as courts . . . with respect

to claims involving public or quasi-private rights"). If Congress may permissibly designate a matter for agency adjudication, nothing prevents Congress from allowing "court-like" procedures to protect the parties' rights. It would be a peculiar doctrine of constitutional law that discouraged Congress from providing the heightened protections that courts-like proceedings afford.

Finally, Cooper invites the Court to rewrite the Patent Act. OB74 ("The Court may . . . declar[e] the following changes to 35 U.S.C. § 318(b)": replacing "canceling" with "stating its opinion as to" and "be" with "appear to it as."). Courts may not do so. *Artuz v. Bennet*, 531 U.S. 4, 10 (2000) ("Whatever merits these and other policy arguments may have, it is not the province of this Court to rewrite the statute to accommodate them."); *Badaracco v. Commissioner*, 464 U.S. 389, 398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement."). Thus, even if Cooper's constitutional arguments were correct—and they are not—the Court should reject Cooper's request to rewrite 35 U.S.C. § 318(b).

## **CONCLUSION**

For the reasons set forth above, this Court should: (1) affirm the Board's claim construction of the terms at issue; (2) decline to consider Cooper's forfeited claim construction arguments; (3) affirm that Pitroda renders claims 1-6 of the '005 Patent and claims 1 and 8-14 of the '207 Patent unpatentable; and (3) affirm

that Kikinis renders claims 1-7, 9-13, 25-31, 33 and 34 of the '875 Patent unpatentable (or alternatively hold that Gutman renders those claims unpatentable). This Court should also hold that *Inter Partes* Review is consistent with Article III of, and the Seventh Amendment to, the U.S. Constitution.

Dated: December 18, 2015    Respectfully submitted,

/s/ Theodore J. Angelis
Theodore J. Angelis
Benjamin Hellerstein
K&L Gates LLP
925 4th Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580

Erika Arner
Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP
Two Freedom Square
11955 Freedom Dr.
Reston, VA 20190-5675
(571) 203-2700

Aaron Capron
Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP
3300 Hillview Avenue
Palo Alto, CA 94304
(650) 849-6600

*Attorneys for Appellee Square, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2015, true and correct copies of the foregoing **ANSWERING BRIEF OF PETITIONER-APPELLEE SQUARE, INC.** were electronically filed and served through the Court's ECF system to all counsel of record in this case.


/s/ Theodore J. Angelis
Theodore J. Angelis

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE
## <u>REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or FRAP 28.1(e).

- The brief contains 17,317 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or FRAP 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

- The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 Point Times New Roman Font.

Dated: December 18, 2015    Respectfully submitted,


/s/ Theodore J. Angelis
Theodore J. Angelis
K&L Gates LLP
*Attorney for Petitioner-Appellee Square, Inc.*